## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **SET SHAHBABIAN, M.D.** | : | **Case No.  1:18-CV-790** |
| **3285 Westbourne Drive** | : | |
| **Cincinnati, Ohio  45248,** | : | **Judge Susan J. Dlott** |
| | : | **Magistrate Judge Stephanie K. Bowman** |
| **Plaintiff,** | : | |
| | : | |
| **-vs-** | : | |
| | : | |
| **TRIHEALTH G, LLC** | : | |
| **d/b/a TriHealth Physician Partners** | : | |
| **619 Oak Street** | : | **PLAINTIFF'S FIRST AMENDED** |
| **Cincinnati, Ohio  45206** | : | **COMPLAINT WITH JURY DEMAND** |
| | : | |
| **and** | : | |
| | : | |
| **TRIHEALTH, INC.** | : | |
| **619 Oak Street** | : | |
| **Cincinnati, Ohio  45206** | : | |
| | : | |
| **and** | : | |
| | : | |
| **MAYFIELD CLINIC, INC.** | : | |
| **3825 Edwards Road, Suite 300** | : | |
| **Cincinnati, Ohio  45209,** | : | |
| | : | |
| **Defendants.** | : | |

This lawsuit involves the unlawful conspiracy between two of Cincinnati's largest healthcare providers, TriHealth, Inc. ("TriHealth") and Mayfield Clinic, Inc. ("Mayfield") to fraudulently destroy the medical practice of a pre-eminent and long standing physician who provided neurosurgical privileges to the folks on the west side of Cincinnati for over 45 years. The reason – to enrich their proverbial pockets. As a result, Plaintiff, Set Shahbabian, M.D., brings the following claims against the Defendants, TriHealth G, LLC, doing business as TriHealth Physician Partners, TriHealth, and Mayfield to redress their unlawful conduct.

## THE PARTIES

1.      Plaintiff is a physician residing on the west side of Cincinnati, Hamilton County, Ohio.

2.      TriHealth OS, LLC ("TriHealth LLC") is an Ohio domestic limited liability company with its principal place of business in Hamilton County, Ohio.  It is not named as a Defendant, but is the assignor of a certain Employment Agreement entered into with Plaintiff and later assigned to Defendant TriHealth G LLC ("TriHealth Physicians").

3.      TriHealth is an Ohio domestic non-profit corporation with its principal place of business in Hamilton County, Ohio.  It is affiliated with Good Samaritan Hospital and owns or controls the operation of that entity.

4.      Defendant TriHealth G, LLC, d/b/a TriHealth Physician Partners ("TriHealth Physicians") is an Ohio domestic, non-profit liability company with its principal place of business in Hamilton County, Ohio.  Upon information and belief TriHealth is the majority and/or sole member of both TriHealth OS, LLC and TriHealth Physicians.

5.      Defendant Mayfield is an Ohio corporation with its principal place of business in Hamilton County, Ohio.

## JURISDICTION AND VENUE

6.      Jurisdiction of this case rests upon 42 U.S.C. §12117, 29 U.S.C. §626(c), and 28 U.S.C. §1331.  Jurisdiction over Plaintiff's state court claims is based upon this Court's supplemental jurisdiction pursuant to 28 U.S.C. §1367.

7.      Venue is based on 28 U.S.C. §1391(b) and §1391(c) because a substantial part of the events giving rise to the claims occurred in this judicial district and the Defendants are

corporations or limited liability companies which are subject to personal jurisdiction in this judicial district.

## STATEMENT OF FACTS

### Plaintiff's Sells his Medical Practice to TriHealth and Begins Employment in 2014

8.      For more than 40 years, Plaintiff has been providing exemplary neurosurgical services to patients located on the west side of Cincinnati.  Plaintiff performed most of his neurosurgeries at Good Samaritan Hospital (a TriHealth hospital).

9.      As a solo neurosurgeon, Plaintiff found himself in competition with the area's largest neurosurgical practice, Mayfield.  Due to its size and revenue production, Mayfield was able to infiltrate and influence TriHealth's clinical oversight of non-Mayfield neurosurgeons, including Plaintiff.

10.     Plaintiff resisted his inclination to confront TriHealth about Mayfield's interference; instead he focused on his patients, offering them a complete menu of services including MRI scans in a state-of-the-art MRI facility that Plaintiff built adjacent to his clinical office to provide his patients expedient imaging studies (at low cost) and to give patients short turn around on neurosurgical diagnoses.

11.     As Plaintiff got older (he is now 75), he began to focus on a succession plan for his practice.  Appreciating that it had no neurosurgeon on the west side (including Mayfield) with the reputation garnered by Plaintiff over 40 years, TriHealth approached Plaintiff about purchasing his practice.  Having no neurosurgical partner or resident to take over the practice, Plaintiff agreed.

12.     Effective May 1, 2014, Plaintiff and TriHealth LLC signed an Employment Agreement, the term of which was five years with the possibility of renewal.  A copy of the Agreement is attached as Exhibit A and incorporated by reference.  The performance of Exhibit A

by TriHealth OS, LLC was guaranteed by TriHealth. This Agreement was later assigned to TriHealth Physicians on or about July 15, 2015.

13. At the same time, TriHealth purchased all the assets of Plaintiff's practice including the MRI equipment and Plaintiff's patient charts. TriHealth also signed five-year leases of Plaintiff's office and MRI facility real estate. Additionally, the Agreement required TriHealth Physicians to make available to Plaintiff reasonable office and work space, physical facilities and equipment, supplies, and support personnel to enable the effective and efficient performance of Plaintiff's responsibilities with TriHealth and Good Samaritan Hospital. (Exhibit A at ¶5)

14. While the Employment Agreement disclaimed the need for Plaintiff to make patient referrals to TriHealth hospitals, TriHealth Physicians and TriHealth otherwise acquired Plaintiff's patient records and knew that Plaintiff historically practiced at Good Samaritan Hospital, a TriHealth facility.

15. In agreeing to the Employment Agreement, Plaintiff intended to continue practicing high volume neurosurgery at Good Samaritan Hospital at least through the initial term of his Employment Agreement. Because Plaintiff devoted seven days a week to his patients, he agreed to tie his compensation to revenue production, so-called "work Relative Value Units" ("wRVUs"). As a neurosurgeon, the only way Plaintiff could generate wRVUs to cover his compensation was to continue performing high volume, high acuity neurosurgeries.

16. As a TriHealth employee, Plaintiff began to appreciate more acutely Mayfield's control of Good Samaritan Hospital's neurosurgical department.

**TriHealth and Mayfield Memorialize Their Partnership**

17. In June of 2014, TriHealth and Mayfield announced a formalized agreement to provide expanded comprehensive neurosurgery services to patients in the TriHealth system. This

4

included providing clinical coverage for Bethesda North Hospital Level 3 Trauma Program as well as for Good Samaritan Hospital and its long standing Neurosurgery and Intensive Care Unit.  Dr. Andrew Ringer ("Ringer"), a neurosurgeon employed by Mayfield, was appointed as the Medical Director of Neurosurgery of the TriHealth Surgical Institute at Good Samaritan Hospital.

18.     With the consummation of TriHealth and Mayfield's separate business interests, TriHealth and Mayfield began to undertake acts to eliminate Plaintiff as a competitor to Mayfield within the TriHealth healthcare system.

### TriHealth and Mayfield Conspire to Eliminate Plaintiff's Neurosurgery Practice by Alleging he is too Old to do Surgery

19.     On March 6, 2015, Plaintiff met with Jamie Easterling ("Easterling"), the Executive Director of Hospital Operations at Good Samaritan Hospital, relating to TriHealth's obligation to provide resident coverage for a patient's hospital stay at Good Samaritan, emergency room coverage, and night call as that was a contractual obligation for TriHealth under the May 2014 agreement with Plaintiff.  Plaintiff was told by Easterling that he would not receive resident coverage at that time, but instead Mayfield would send a fourth or fifth year resident to Good Samaritan Hospital in order to cover the Mayfield physicians that were working there.

20.     One week later, on March 15, 2015, and less than one year after Plaintiff had signed his Employment Agreement, Dr. George Kerlakian ("Kerlakian"), the Chairman for Good Samaritan's Department of Surgery and Co-Chair of the TriHealth Surgical Institute, spoke with Plaintiff and told him that he was required to be "checked" to verify his competency to make sure he possessed  no health issues.  The reason offered by Kerlakian was that even though Plaintiff was over the age of 70 at the time he signed his Employment Agreement in May of 2014, Plaintiff must "be checked" every year because he is over the age of 70.  Kerlakian admitted that there is no age restriction for surgeons at Good Samaritan Hospital, but that this was a requirement that

Mayfield was demanding. Plaintiff opposed this unwarranted requirement as it was not in his Agreement and had never been imposed on other physicians or younger physicians on the medical staff at Good Samaritan Hospital with a relationship with TriHealth.

21.     On March 27, 2015, Kerlakian again told Plaintiff that although no requirement existed in the Good Samaritan Hospital bylaws for an annual exam of a physician over 70 years old, he would need to undergo a neuropsychological analysis as well as a medical check-up. Plaintiff protested. Kerlakian admitted that there was no policy "per se" for a post-70 year old physician to undergo such a medical exam for Good Samaritan Hospital, but Plaintiff would be the first. Kerlakian identified the proponent of this unlawful exam policy as Dr. Bob Collins ("Collins"), Sr. Vice President of Quality and Chief Medical Officer at TriHealth.

### TriHealth and Mayfield conspire to Eliminate Plaintiff's Neurosurgery Practice by Falsely Claiming that Quality Issues Existed Regarding his Surgical Competency.

22.     While using age as a criterion to undermine Plaintiff's physical competency, Mayfield and its physicians in concert with TriHealth, Inc. began to falsely question Plaintiff's surgical competence.

23.     In early April 2015, Good Samaritan Hospital/TriHealth and Mayfield dishonestly claimed that quality issues existed with respect to two recent patients treated by Plaintiff. The initial participants in the quality care discussion were Kerlakian, Collins, Dr. Helen Koselka ("Koselka"), Chairman, Department of Medicine, Dr. John Robinson ("Robinson"), Senior Vice President of Hospital Operations for TriHealth, and Easterling.

24.     On April 2, 2015, Plaintiff met with Collins, Kerlakian and Koselka at Good Samaritan Hospital. Collins initiated the meeting by asking the Plaintiff about his health and well-

being, and questioning his ability to perform surgical procedures. Plaintiff responded that he was fine and that he would never put any patient at risk if he didn't feel confident in his health.

25.    Kerlakian stated that there were two patients whose treatment by Plaintiff had been questioned. Plaintiff stated that his treatment of the two patients was within the standard of care and the complications that may have occurred for those patients were not the result of any poor performance by him. Plaintiff was told by Kerlakian that two physicians from Mayfield had questioned Plaintiff's competency for these two patients.

26.    Once again, Collins and Kerlakian insisted that Plaintiff undergo an unwarranted medical evaluation. The panel threatened Plaintiff that if he refused, they would initiate formal peer review proceedings through the Medical Executive Committee ("MEC") at Good Samaritan Hospital. Plaintiff suggested that his treatment for the two patients be reviewed by an independent physician and Plaintiff recommended Dr. John Tew, a well-known, respected neurosurgeon in Cincinnati. Later that day, Plaintiff was told by a TriHealth employee that she had heard executives at TriHealth referring to Plaintiff's surgical techniques as old and that they were attempting to "get [him] out of here".

27.    On April 9, 2015, Plaintiff met with Dr. Jay Koch ("Koch"), Vice President of TriHealth Orthopaedic and Spine Institute, Easterling, and Robinson. Prior to this meeting, Plaintiff had continued to complain that TriHealth and Good Samaritan Hospital had not arranged for call coverage relating to his neurosurgery patients that he was admitting to Good Samaritan Hospital. Plaintiff continued to emphasize that over the prior three months he had requested call coverage for his patients which was a requirement TriHealth was obligated to provide under his Employment Agreement.

28.     At the April 9, 2015 meeting, Robinson acknowledged that Dr. Tew had agreed to evaluate the two patient cases that the Mayfield physicians claimed demonstrated substandard care. Robinson asked Plaintiff if he would be willing to give the "hard cases" (patients) to Dr. Chris McPherson ("McPherson") and Mayfield.  Plaintiff responded that it was unfair that he be required to refer patients for whom he has cared for over 40 years and who had trusted Plaintiff with their care, to McPherson.

29.     Robinson then suggested that Plaintiff should join Mayfield.  Plaintiff responded that it was obvious to him that "[Mayfield is] trying to terminate my contract with TriHealth/Good Sam".   Plaintiff accused TriHealth and Mayfield of "going through the back door" in the credentialing process in order to disqualify Plaintiff from performing as a neurosurgeon for TriHealth and Good Samaritan Hospital.

30.     Robinson continued to insist upon a bogus psychiatric evaluation.  Plaintiff told Robinson and the panel that he had undergone a medical evaluation and had passed.  Robinson told Plaintiff that the type of test TriHealth expected was the type of test that airline pilots take each year and that the results of his test would remain confidential and not disclosed to TriHealth or Good Samaritan unless he granted permission for the disclosure.  Plaintiff replied that he was not an airline pilot and if confidentiality was assured then "why am I having this test".

**TriHealth Directs New Neurosurgery Patients to Mayfield and Not Plaintiff**

31.     It was clear to Plaintiff that TriHealth and Mayfield had concocted a scheme whereby the obligations to supply the resources to fulfill Plaintiff's Employment Agreement would not be met and more importantly, the patient population that Plaintiff had cultivated over 40 years of practice on the west side of Cincinnati was to be redirected to Mayfield.  Their illegal conspiracy was evidenced by the fact that new patients arriving at TriHealth/Good Samaritan Hospital were

not being directed to Plaintiff for treatment as the TriHealth employed neurosurgeon, but instead were being directed to Mayfield.

32.     On April 15, 2015, Dr. Tew completed his review of the two cases at issue and found no evidence of any deviation by Plaintiff from the standard of care.  Dr. Tew also agreed to make himself available to any peer review committee in order to explain his opinion regarding Plaintiff's care.  Neither Good Samaritan Hospital nor TriHealth ever sought Dr. Tew's opinion on Plaintiff's behalf.

33.     On or about April 21, 2015, Plaintiff received a telephone call from Robinson. During the conversation, Plaintiff told Robinson that one of Plaintiff's patients had asked to see Plaintiff for treatment, but had been directed by the patient's TriHealth primary care physician to not seek medical care from Plaintiff, but instead see one of the physicians at Mayfield.  During this call, Robinson ignored Plaintiff's complaint and again insisted Plaintiff undergo a medical examination.  Plaintiff protested that the request by Robinson and TriHealth amounted to age discrimination.

34.     On April 29, 2015, Plaintiff met Kerlakian, Dr. Saba, Dr. Matthew Recht, and Ringer.  At this meeting, Kerlakian asked Plaintiff when he intended to retire and transfer his patients to new people.  Plaintiff responded that if TriHealth wished to have a new physician take over his neurosurgery practice, the proposed replacement should report to his office in Western Hills and he could gradually transfer his practice to that physician over the upcoming years. Kerlakian told Plaintiff that such an arrangement was impossible because the contract between TriHealth and Mayfield prohibited TriHealth from hiring any new neurosurgeon physicians within its hospital system outside of the Mayfield practice.

9

35.     As an alternative to hiring a physician to work in Plaintiff's Western Hills office, Kerlakian suggested to Plaintiff that when performing a difficult surgery that he consult with and have available a Mayfield physician including, but not limited to, Ringer or McPherson. Plaintiff rejected that suggestion.

36.     Part of the TriHealth family includes a center called Arrow Springs in Lebanon, Ohio. On May 1, 2015, Plaintiff was told by another physician that he had received a call from a nurse at Arrow Springs the night before regarding treatment for a patient with a cerebella stroke who perhaps needed consideration of a posterior fossa decompression. The physician told the Arrow Springs nurse that Dr. Shahbabian was on call at Good Samaritan Hospital and would take care of the patient. The nurse responded that he had been instructed by his supervisors to only refer neurosurgical patients to the physicians at Mayfield. Accordingly, the patient was sent to a Mayfield Group physician. This was the third occasion that patients that should have been treated by Plaintiff as the in-house neurosurgeon for TriHealth at Good Samaritan Hospital, but were instead referred to neurosurgeons employed by Mayfield.

37.     By May 19, 2015, TriHealth had unilaterally directed its employed hospitalists at Good Samaritan Hospital to refer all of the incoming neurosurgical cases to physicians at Mayfield and not inform Plaintiff of their presence. The Mayfield physicians who were referred cases in this manner included Dr. George Mandybur, McPherson and Dr. Bohinski. TriHealth was "loading up" its neurosurgical cases with Mayfield.

**TriHealth Deceitfully Limits Plaintiff's Neurosurgical Privileges**
**and Requires Him to Consult with Mayfield Physicians**
**Before Performing Surgery**

38.     To increase the patient population available to Mayfield for neurosurgical procedures, Kerlakian, on behalf of TriHealth and Good Samaritan Hospital, sent a letter to

Plaintiff on or about June 1, 2015. The letter was issued as a result of the prior two patient cases where Ringer and McPherson had underhandedly claimed that Plaintiff's care was substandard. These are the same two cases in which Dr. Tew independently found that Plaintiff had not provided substandard care.

39. In the June 1, 2015 letter, TriHealth demanded that Plaintiff:

- reduce the daily surgical block allotted to him for neurosurgery on his patients to six hours;

- engage in a pre-operative review of intercranial cases with the neuro section chair [Dr. Andrew Ringer of Mayfield] before initiating any operating procedure;

- cease scheduling patients who required spinal decompression exceeding three levels, and multilevel spinal fusions or revisions;

- consult with an associate neurosurgeon [Mayfield] relating to issues that arise inter-operatively.

40. Kerlakian ended the June 1, 2015 letter with a handwritten notation, "Set, ideally this would be a collegial agreement where you would volunteer to limit your practice according to the above guidelines. Thanks, George."

41. Approximately 10 days later, Plaintiff spoke to Kerlakian about the June 1, 2015 letter. Plaintiff questioned how TriHealth and Good Samaritan could impose the limitations on his neurosurgery practice when Dr. Tew had found no issues with respect to Plaintiff's care. Kerlakian stated there was no discretion with respect to the limitations contained in the June 1, 2015 letter. Plaintiff was told that McPherson from Mayfield had drafted the June 1st limitations

11

and they had been approved by Ringer from Mayfield as the Director for Neurosurgery. for TriHealth and Good Samaritan Hospital.

42.     With the threat of losing his hospital credentialing, but having disproved the fake allegations, Plaintiff reluctantly agreed to limit his practice by either not operating on certain high acuity patients or performing those surgeries with a Mayfield physician.

43.     After 40 years of successfully operating on all kinds of neurosurgical patients, Plaintiff was now required to subject himself to the supervision and consent of Mayfield doctors, many of whom he trained as residents.

**TriHealth and Mayfield Deceptively Claim Plaintiff has Experienced
Surgical Complications so that TriHealth can Transition Plaintiff's
Surgical Practice to Mayfield**

44.     Throughout the remaining years in late 2015, 2016 and 2017, Mayfield and TriHealth continued to negotiate and cement their relationship to the detriment of Plaintiff.  By early 2016 McPherson was publicly and deceitfully complaining that Plaintiff was experiencing significant complications with his continuing treatment of patients at Good Samaritan Hospital.

45.     McPherson's statements were part of the conspiracy between TriHealth and Mayfield to eliminate Plaintiff's neurosurgical practice and transfer his current patient base to Mayfield.  This conspiracy included the removal of MRI scanners and equipment from Plaintiff's west side office so that Mayfield would be the beneficiary of patients needing these services.  A copy of the letter from Plaintiff asking that the decision to remove the MRI scanners from his office be revoked is attached as Exhibit B.

46.     In an email dated May 12, 2016, Mark Farrington ("Farrington"), the CEO for Mayfield, described to the other Mayfield officers including Ringer and McPherson the continuing negotiations between Mayfield and TriHealth.  In the email, Farrington acknowledged that Gail

Donovan, Executive Vice President for TriHealth, had already agreed to transition Plaintiff's neurosurgical practice to Mayfield.  Over the next year, representatives from TriHealth urged Plaintiff to retire and transition his patient base to Mayfield without disclosing to him that the patient transition was already a "done deal".

47.    Without knowledge that the transition of his neurosurgery practice to Mayfield was a fait accompli, Plaintiff agreed to a compensation plan in which the amount of his compensation would be determined by relative value units ("wRVU") associated with his production for TriHealth.  Specifically, his compensation was determined by the following:

### Compensation

As full compensation for services Physician performs for Company, Company shall pay Physician the annualized amount of Nine Hundred Sixty-Eight Thousand Dollars ($968,000).  Notwithstanding the foregoing, in the event that during any Annual Period, Physician produces less than 11,700 wRVUs through Physician's personally-performed services for the Company, the Company shall reduce Physician's compensation for such Annual Period (with such reduction to be recouped by Company from future compensation) by an amount equal to (i) $968,000, multiplied by a percentage equal to the sum of (1) one hundred percent (100%), less (ii) the Actual Production Percentage for the Annual Period.  The "Actual Production Percentage" means the percentage equal to (i) the number of wRVUs produced by the Physician through Physician's personally-performed services for the Company during the Annual Period, divided by (ii) 11,700.  (Exhibit A)

48.    TriHealth/TriHealth Physicians knew in 2015 and 2016 that Plaintiff would never reach the 11,700 wRVUs to support his salary throughout the length of Plaintiff's Employment Agreement.  That is because they had secretly agreed with Mayfield to transition Plaintiff's neurosurgical patient base to Mayfield and redirect future neurosurgery patients to that entity. However, for the period of time it took for the transition to occur, TriHealth agreed to pay Plaintiff his salary because they insisted upon a "clawback" provision in Plaintiff's Employment Agreement. This provision allowed TriHealth to recoup from Plaintiff the money TriHealth paid

to him after the complete transition of Plaintiff's neurosurgery practice by falsely alleging claims of substandard patient care. These false claims served as a conduit for TriHealth's bogus allegations of below patient care thereby allowing it to threaten, and utilize, if necessary, the crooked application of Good Samaritan Hospital's peer review process to eliminate Plaintiff's neurosurgical practice. The eradication of Plaintiff's surgical privileges wiped out the potential to earn wRVUs for neurosurgical procedures thereby achieving TriHealth's original goal of recouping the monies Plaintiff was paid as a salary while the clandestine transition of Plaintiff's surgical and ultimately medical practice was occurring

49.     The actions of the Defendants amounted to fraud.

50.     By late 2016 and early 2017 the transition plan of Plaintiff's patient population to Mayfield was in its final stages. On April 27, 2017, Plaintiff was informed of two patients where his care was allegedly reviewed by the Clinical Quality Resources Department for Good Samaritan Hospital. Plaintiff responded to the peer review inquiry and identified that appropriate care had been provided by him to these patients.

51.     Three weeks later, on May 16, 2017, TriHealth announced the creation of the TriHealth Neuroscience Institute in partnership with Mayfield. Andrew Ringer, Mayfield's Director of Cerebrovascular Surgery, was chosen to lead the TriHealth Neuroscience Institute. He was supported by McPherson, who would serve as the site director at Good Samaritan Hospital. It was reported that TriHealth would invest more than 40 million dollars in equipment, specialized staff, and facilities for a new state of the art diagnostic surgical navigation and surgical technologies for the treatment of neurological and neurosurgical care for its patients.

52.     Two days later at approximately 2:00 p.m. on Thursday, May 18, 2017, Plaintiff was summoned to a meeting with Collins, Koselka, and the MEC Chairperson for the Good

Samaritan Hospital.  Plaintiff was told by Collins that McPherson had insisted that Plaintiff had provided substandard care to a neurosurgical patient.  Plaintiff countered that the allegation was untrue.  Collins alleged that Plaintiff was a danger to society, patients, and the hospital.  Plaintiff was presented with a document that had been prepared in anticipation of the meeting which demanded that he voluntarily relinquish his surgical operating privileges at Good Samaritan Hospital. If he refused to relinquish his surgical practice, he was warned that the peer review process at TriHealth/Good Samaritan Hospital would be utilized to eliminate his surgical privileges and that he would be reported to the National Practitioners Data Bank ("NPDB").  His medical career would be gutted.  He was told that his patients, who needed surgery, were to be referred to substantially younger physicians from Mayfield and specifically McPherson and Dr. Zachary J. Tempel.  Because Plaintiff saw that the decision to revoke his privileges had been predetermined, he had no alternative but to agree or face the annihilation of his medical career by a NPDB report.

53.     Although Plaintiff resigned his surgical privileges under duress in the summer of 2017, he still expected to take care of his patients clinically and refer them to a competent neurosurgeon in the event of surgery.  Rather than foster Plaintiff's clinical care, however, TriHealth told referring doctors in the TriHealth system that Plaintiff was retiring as a physician. Not surprisingly, patient referrals dwindled to little or none.

### With the Transition of his Medical Practice to Mayfield Completed, TriHealth Begins the Recoupment of his Salary it Paid Over the Prior Years

54.     Without the opportunity of generating the wRVUs associated with his surgical practice, the number of wRVUs by which Plaintiff's financial performance was measured decreased thereby materially adversely affecting Plaintiff's compensation.   In May of 2017, Plaintiff performed activities which produced total wRVUs of 915.06.  With the absence of

Plaintiff's surgical practice, Plaintiff's monthly wRVUs were reduced to 162.74 in June, 154.80 in July, 132.20 in August, 120.50 in September, 81.47 in October, 80.30 in November, 80.47 in December, 29.22 in January, and 75.82 in February. The TriHealth Work RVU Report for Plaintiff is attached as Exhibit C.

55.     In late February and early March, 2018, TriHealth audited Plaintiff's wRVUs and claimed there was $630,000.00 deficiency pursuant to his Employment Agreement. Having destroyed Plaintiff's practice, he was now being negatively assessed for TriHealth and Mayfield's insistence that he abandon his neurosurgery practice. Referrals that historically were earmarked for Plaintiff were now diverted to Mayfield. With the transition of Plaintiff's practice completed, it was now time to "clawback" Plaintiff's compensation.

56.     Through March 17, 2018, Plaintiff was paid every two weeks at the hourly rate of $450.19 which was consistent with the compensation structure contained in his Employment Agreement. (Attached as Exhibit D)  Beginning in April 2018, TriHealth and TriHealth Physicians unilaterally reduced his hourly rate to $73.05 based upon their claim that Plaintiff had failed to reach the RVU threshold of 11,700 per year and therefore they were entitled to "clawback" from Plaintiff's compensation for the amounts they had allegedly overpaid him the prior years. Plaintiff's paychecks for the beginning of April are attached hereto as Exhibits E and F.  (See Exhibit G attached)

57.     After 40 years of devoted service to Good Samaritan Hospital and the west side community, Plaintiff and his clinical practice were destroyed by Defendants.

58.     On June 13, 2018, Plaintiff filed a complaint in the Court of Common Pleas of Hamilton County, Ohio, under Case No. A1802928.  In the complaint Plaintiff alleged that TriHealth Physicians had discriminated against him because of his age in violation of Ohio

16

Revised Code §4112.02(A) and §4112.99 and that Mayfield had tortiously interfered with his Employment Agreement.

59.     Thereafter, on July 25, 2018, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging age and disability discrimination against both TriHealth Physicians and TriHealth. A copy of the charge is attached as Exhibit H and incorporated by reference. Sixty days have passed since the filing of the charge with EEOC.

60.     In retaliation for the filing of Plaintiff's lawsuit and the charge of discrimination, Plaintiff received a letter on or about October 1, 2018, in which he was notified that TriHealth Physicians would not be renewing his Employment Agreement when it expired on May 1, 2019. A copy of the letter is attached as Exhibit I.

61.     In addition, TriHealth and/or TriHealth Physicians again retaliatorily reduced Plaintiff's compensation to $10.00 per hour for a grand total of $800.00 every two weeks so that the hourly employees working at Plaintiff's west side medical office and even the fast food employees working down the street were now earning more than he, as a physician with TriHealth. A copy of the pay reduction document is attached as Exhibit J.

## COUNT I
### (Breach of Contract Against TriHealth and TriHealth Physicians)

62.     Plaintiff realleges the allegations contained in paragraphs 1 through 61 as if fully rewritten herein.

63.     Until May 1, 2014, Plaintiff was employed in the practice of neurology and neurosurgery as a solo practitioner.

64.     Effective May 1, 2014, Plaintiff and TriHealth LLC entered into an Employment Agreement to provide professional medical services to TriHealth LLC and TriHealth. Those services were to be performed at various hospitals and outpatient facilities throughout Cincinnati

including, but not limited to, Good Samaritan Hospital.  A copy of the Employment Agreement is attached as Exhibit A.

65.     On July 15, 2015, the TriHealth LLC Agreement was amended and subsequently assigned to TriHealth Physicians, effective January 1, 2016.

66.     Effective May 1, 2015, Plaintiff and TriHealth Physicians entered into an Amended & Restated Second Amendment to the Employment Agreement ("the Amendment").  A copy of the Amendment is attached as Exhibit A and incorporated by reference.

67.     In each of these contracts there existed a duty of good faith and fair dealing between the parties.

68.     Pursuant to the Amendment, TriHealth Physicians was to pay Plaintiff the amount of $968,000 based upon a production quota of 11,700 wRVUs until May 1, 2019.

69.     Subsequent to May 1, 2015, TriHealth Physicians and TriHealth intentionally reduced the amount of work available to Plaintiff, thereby prohibiting him from reaching his wRVU quota.

70.     The reduction of the work available to Plaintiff was without just cause by TriHealth Physicians and TriHealth was for the purpose of reducing Plaintiff's compensation of $ 968,000 as set forth in the Amendment.

71.     The Amendment also provides that, "all of the other terms, conditions and covenants of the May 1, 2014 Agreement are hereby ratified and reaffirmed and remain in full force and effect."

72.     The Employment Agreement called for TriHealth Physicians and TriHealth to undertake an annual performance review designed to assess Plaintiff's performance to determine if he was meeting his employer's expectations.

18

73.     TriHealth Physicians and TriHealth failed to undertake these annual performance reviews in breach of the Employment Agreement.  TriHealth also breached the Employment Agreement  by failing to provide the necessary resources including call coverage in order for Plaintiff to perform under the Agreement.

74.     Additionally, during the term of the Amendment, Plaintiff was entitled to participate in all health benefits TriHealth offered to other fulltime physician employees, subject to the plan documents and applicable state laws and regulations.

75.     Since May 1, 2015, Plaintiff has been required to take paid time off ("PTO"), FMLA, and short term disability.

76.     TriHealth Physicians and TriHealth have reduced Plaintiff's compensation during the time he has used these benefits, thereby artificially reducing his wRVUs while utilizing the employee welfare plan benefits to which he is entitled.

77.     TriHealth Physicians and TriHealth's actions are a breach of contract for which Plaintiff is entitled to damages.  Further, TriHealth Physicians' and TriHealth's actions are in bad faith entitling Plaintiff to attorney's fees.

### COUNT II
**(Federal Age Discrimination in Violation of 29 U.S.C. §626 et seq**
**Against TriHealth Physicians and TriHealth)**

78.     Plaintiff realleges the allegations contained in paragraphs 1 through 77 as if fully rewritten herein.

79.     Plaintiff is over the age of 40.  Defendants TriHealth Physicians and TriHealth are Plaintiff's employers.

80.     During Plaintiff's employment, he performed his job duties in a competent and capable manner.

81. Notwithstanding Plaintiff's excellent performance, TriHealth and TriHealth Physicians discriminated against Plaintiff on a continuing basis since March of 2015.  That discrimination included, but is not limited to:

(A) requiring Plaintiff to undergo a medical exam because he is over the age of 70;

(B) requiring Plaintiff in 2015 to seek the consent of Ringer and Mayfield in order to perform neurosurgical procedures based upon the pretextual reason that certain complications occurred to two patients because of substandard care when the facts showed otherwise and no other younger physicians were treated similarly as Plaintiff;

(C) forcing Plaintiff to relinquish his surgical procedures in 2017 based upon the pretextual reason that certain complications to three patients were below the applicable standard of care when the facts showed otherwise and no other younger physician was treated similarly as Plaintiff;

(D) threatening Plaintiff with peer review proceedings and a report to the National Practitioners Data Bank for alleged patient complications when substantially younger physicians with greater complications have not been subjected to the same treatment;

(E) reducing Plaintiff's pay for his alleged failure to meet the 11,700 wRVU level when other substantially younger physicians did not meet their wRVU level and their pay was not reduced or "clawed back";

20

(F)    reassigning his surgical and medical patients to substantially younger physicians, McPherson and Tempel;

(G)    not renewing his Employment Agreement;

(H)    continuing to seek Plaintiff's retirement;

(I)    failing to provide Plaintiff the resources he needed such as call coverage when similar resources were provided to substantially younger physicians.

82.    The actions of TriHealth Physicians and TriHealth are because of Plaintiff's age in violation of 29 U.S.C. §623(a) et seq. and the Age Discrimination in Employment Act ("ADEA"). Plaintiff requests all remedies to which he is entitled under the ADEA.

## COUNT III
### (Retaliation in Violation of 29 U.S.C. §626(d) Against TriHealth and TriHealth Physicians)

83.    Plaintiff realleges the allegations contained in paragraphs 1 through 82 as if fully rewritten herein.

84.    On June 13, 2018, Plaintiff filed a lawsuit against Defendant TriHealth Physicians. Defendant received the lawsuit.

85.    On July 25, 2018 Plaintiff filed a charge of discrimination against Defendants TriHealth and TriHealth Physicians.

86.    Subsequent to the filing of the lawsuit and the charge of discrimination, TriHealth Physicians and TriHealth retaliated by reducing Plaintiff's compensation to $10.00 per hour and notifying him that they would not be renewing his Employment Agreement.

87.    The retaliatory actions of TriHealth Physicians and TriHealth are a violation of 29 U.S.C. §623(d).

88.     As a result of TriHealth Physicians and TriHealth unlawful conduct, Plaintiff requests all relief to which he is entitled under the ADEA.

## COUNT IV
### (Violation of O.R.C. §4112.14(A) Against TriHealth)

89.     Plaintiff realleges the allegations contained in paragraphs 1 through 88 as if fully rewritten herein.

90.     O.R.C. §4112.14(A) prohibits an employer from discriminating against Plaintiff because of his age in job openings or discharging without just cause because he is over the age of 40.

91.     Defendant TriHealth, as an employer, discriminated against Plaintiff because of age as described herein.  That discrimination includes, but is not limited to the areas designated in paragraph 81(a-i).

92.     In addition, TriHealth discriminated against Plaintiff by reducing his salary in the spring and fall of 2018 and not renewing his Employment Agreement.

93.     The actions of TriHealth were because of Plaintiff's age in violation of O.R.C. 4112.14(A) et seq.   Plaintiff requests all remedies to which he is entitled under this statute.

## COUNT V
### (Violation of O.R.C. §4112.02(A) and §4112.99 Against
### TriHealth and TriHealth Physicians)

94.     Plaintiff realleges the allegations contained in paragraphs 1 through 93 as if fully rewritten herein.

95.     Plaintiff states that O.R.C. §4112.02(A) prohibits an employer from discriminating against any person because of their age.  Defendants TriHealth and TriHealth Physicians discriminated against Plaintiff as set forth in paragraphs 81(a-i) and 92.

22

96.     In addition to the conduct set forth in the previous paragraphs of this complaint, Plaintiff states that TriHealth Physicians has reduced his pay based upon its unilateral decision to reduce the availability of work to Plaintiff, thereby refusing his wRVU quota.    TriHealth Physicians and TriHealth continued to harass Plaintiff because of his age, informing third parties that he has retired, directing his patients to other younger physicians, and generally making Plaintiff's work conditions less desirable than that of younger, similarly situated physicians.    These acts were taken and are being taken because of Plaintiff's age in violation of O.R.C. §4112.02(A) and §4112.99.

## COUNT VI
### (Retaliation Against TriHealth and TriHealth Physicians
### Pursuant to O.R.C. §4112.02(I) and §4112.99)

97.     Plaintiff realleges the allegations contained in paragraphs 1 through 96 as if fully rewritten herein.

98.     Throughout his employment, Plaintiff complained that the agents of TriHealth Physicians and TriHealth were discriminating against him because of his age.    Those complaints began in 2015 and continued through 2018.

99.     Ohio Revised Code §4112.02(I) prohibits any person from retaliating against any person who has participated in procedures or opposed unlawful discriminatory conduct as set forth in Chapter 4112.

100.     In retaliation to Plaintiff's complaints of age discrimination in opposing TriHealth Physicians' and TriHealth's unlawful conduct and participating in a civil lawsuit and the filing of an EEOC charge, TriHealth Physicians and TriHealth took the following actions in violation of O.R.C. §4112.02(I):

(A)   requiring Plaintiff to undergo a medical exam because he is over the age of 70;

(B)   requiring Plaintiff in 2015 to seek the consent of Ringer and Mayfield in order to perform neurosurgical procedures;

(C)   forcing Plaintiff to relinquish his surgical procedures in 2017 based upon the pretextual reason that certain complications to patients were below the applicable standard of care;

(D)   threatening Plaintiff with peer review proceedings and a report to the National Practitioners Data Bank for alleged patient complications when substantially younger physicians with greater complications have not been subjected to the same treatment;

(E)   reducing Plaintiff's pay for his alleged failure to meet the 11,700 wRVU level when other substantially younger physicians did not meet their wRVU level and their pay was not reduced or "clawed back";

(F)   reassigning his surgical patients to substantially younger physicians;

(G)   not renewing his Employment Agreement.

101.   As a direct and proximate result of Plaintiff's participatory and oppositional conduct, he is entitled to all relief as set forth in O.R.C. §4112.99.

## COUNT VII
### (Aiding and Abetting Against TriHealth, TriHealth Physicians, and Mayfield)

102.   Plaintiff realleges the allegations contained in paragraphs 1 through 101 as if fully rewritten herein.

103.   Ohio Revised Code §4112.02 makes it an unlawful employment practice for any person to aid, abet, incite, compel or coerce the doing of any act declared by this section to be a

unlawful discriminatory practice or to attempt to directly or indirectly to commit any act declared by Chapter 4112 to be an unlawful discriminatory practice.

104.    Mayfield and its agents, including but not limited to, Farrington, Ringer, McPherson, Drs. Arand and Kachmann, aided and coerced TriHealth and TriHealth Physicians in discriminating against Plaintiff because of his age by insisting upon a medical exam because he was over 70, aiding in the unlawful transition of Plaintiff's practice to Mayfield, and promoting Plaintiff's replacement to assume Plaintiff's referral base.  These acts, included but were not limited to those set forth in paragraphs 81(a-i) and 92.

105.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff is entitled to all relief as set forth in O.R.C. §4112.99.

### <ins>COUNT VIII</ins>
**(Common Law Fraud Against TriHealth and TriHealth Physicians)**

106.    Plaintiff realleges the allegations contained in paragraphs 1 through 105 as if fully rewritten herein.

107.    In 2015 and 2016 TriHealth Physicians and TriHealth renegotiated Plaintiff's compensation to coincide with his productivity to be measured by wRVUs.

108.    The wRVU production agreed upon by Plaintiff and TriHealth Physicians and TriHealth was 11,700 per year.  This wRVU level would be the basis for Plaintiff's salary of $968,000.

109.    In order to reach the 11,700 wRVU level, Plaintiff needed to continue his neurosurgery practice because the surgical procedures produced high wRVUs.  Without continuing to perform neurosurgical procedures, it was impossible for Plaintiff to reach the 11,700 level.

110.    Without knowing that TriHealth Physicians and TriHealth had already decided to eliminate the high wRVU procedures from Plaintiff's practice, Plaintiff agreed to the wRVU

25

calculations as a method for determining his salary. Plaintiff also unwittingly agreed to the "clawback" provision in the event he failed to reach the 11,700 wRVU level.

111. TriHealth Physicians and TriHealth intentionally withheld from Plaintiff information that they were transitioning his practice to Mayfield and grooming his replacement with Mayfield for future patient referrals. They also withheld from Plaintiff their professed intent to accomplish this task by claiming Plaintiff was too old, required a medical exam in order to continue to operate, was experiencing patient complications because of substandard care, and withholding the necessary call coverage support in order to effectively accomplish the task assigned under this Employment Agreement. Plaintiff was unaware that he was being set up to fail.

112. If Plaintiff had known that TriHealth Physicians and TriHealth intended to steal his practice and auction it to Mayfield, Plaintiff would never have agreed that his performance would be measured by an RVU standard of 11,700 and that the money paid to him as salary for his performance if he failed to meet the 11,700 wRVU standard, could be recouped.

113. TriHealth Physicians' and TriHealth' conduct in failing to inform Plaintiff of the foregoing facts was material to his decision to enter into the 2014 employment agreement and subsequently agree to a compensation structure which was based upon an 11,700 wRVU standard. Plaintiff materially relied upon the good faith negotiation of the Defendants and assumed that he was not being set up to fail which allowed the TriHealth Physicians and TriHealth to plunder his medical practice and peddle it to Mayfield.

114. TriHealth Physicians' and TriHealth's conduct amounts to fraud.

115.    As a direct and proximate result of TriHealth Physicians' and TriHealth's unlawful conduct, Plaintiff is entitled to damages for the loss of his medical practice in an amount not less than ten million  ($10,000,000) dollars.

116.    Furthermore, TriHealth Physicians' and TriHealth's conduct was willful and in wanton disregard of Plaintiff's right to be free from fraud and consequently he is entitled to punitive damages in an amount not less than fifty million ($50,000,000) dollars.

## COUNT IX
### (Tortious Interference with Contract and Prospective Business Relationships Against Mayfield)

117.    Plaintiff realleges the allegations contained in paragraphs 1 through 116 as if fully rewritten herein.

118.    Tortious interference with a contract occurs when a person without privilege to do so induces or otherwise purposely causes a third person no to enter into or continue a business relationship with another, or to not perform a contract with another. *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14 (1995)

119.    The elements are (1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) lack of justification, and (5) resulting damages. *Kenty v. Transamerica Premium Ins. Co.*, 72 Ohio St.3d 415, 419 (1995).

120.    Mayfield was aware of the existence of Plaintiff's Employment Agreement with TriHealth Physicians and TriHealth.

121.    Beginning in 2014, Mayfield took steps to induce TriHealth and TriHealth Physicians to procure the breach of Plaintiff's Employment Agreement.  Those efforts included Mayfield's agents such as Ringer and McPherson claiming that Plaintiff was providing

substandard care so that Plaintiff would be unable to care for his existing patients. It also included efforts by Farrington, Ringer, McPherson, Arand and Kachmann, as agents for Mayfield directing that TriHealth and TriHealth Physicians transition Plaintiff's neurosurgical patient base, including surgical and clinical patients, to Mayfield.

122.     The foregoing efforts resulted in TriHealth and Mayfield fraudulently procuring an wRVU base compensation formula which TriHealth, TriHealth Physicians and Mayfield knew Plaintiff could not achieve.

123.     Mayfield also procured the non-renewal of Plaintiff's Employment Agreement by TriHealth and TriHealth Physicians, the notice of which was provided to Plaintiff on or about October 1, 2018.

124.     There was no justification for the actions of Mayfield and as a result, Plaintiff has incurred damages for the loss of his medical practice and the future loss of income in the amount to of ten million ($10,000,000) dollars.

125.     The actions of Mayfield were willful and in wanton disregard of Plaintiff's legal rights thereby entitling Plaintiff to punitive damages in the amount of fifty million ($50,000,000) dollars.

## COUNT X
### (Common Law Civil Conspiracy Against TriHealth, TriHealth Physicians, and Mayfield)

126.     Plaintiff realleges the allegations contained in paragraphs 1 through 125 as if fully rewritten herein.

127.     The tort of civil conspiracy is a malicious combination of two or more persons to injure another in person or property in a way not competent for one alone, resulting in actual damages. *Williams v. Aetna Fin. Co.*, 83 Ohio St.3d r464, 475 (1998).

128.     Mayfield, TriHealth and TriHealth Physicians maliciously conspired to injure Plaintiff in his person and property by defrauding Plaintiff.  Those efforts included, but were not limited to, Ringer, acting as the Chief of Neurosurgery for Good Samaritan Hospital, a TriHealth entity, and McPherson, falsely alleging that Plaintiff was providing substandard care so that TriHealth and TriHealth Physicians could threaten the utilization of Good Samaritan Hospital's peer review process to force Plaintiff to relinquish his surgical privileges.  It also included the agreement between Mayfield, TriHealth and TriHealth Physicians to steal Plaintiff's medical practice, by claiming Plaintiff was too old and incompetent to do surgery thereby accomplishing the transition of Plaintiff's medical practice to Mayfield and grooming Plaintiff's replacement.

129.     As a direct and proximate result of the actions of the Defendants, Plaintiff has incurred damages for the loss of his medical practice and the future loss of income in the amount to of ten million ($10,000,000) dollars.

130.     The actions of the Defendants were willful and in wanton disregard of Plaintiff's legal rights thereby entitling Plaintiff to punitive damages in the amount of fifty million ($50,000,000) dollars.

## COUNT XI
### (Disability Discrimination Under the Americans with Disabilities Act Against TriHealth and TriHealth Physicians)

131.     Plaintiff realleges the allegations contained in paragraphs 1 through 130 as if fully rewritten herein.

132.     The Americans with Disabilities Act ("ADA") prohibits an employer from discriminating against a person because of their disability.

133.     In January of 2018, Plaintiff took reasonable time off from work for an illness due to a heart attack.  In 2017 and 2018, Plaintiff took time off from work for knee surgery.  The illness

to Plaintiff's heart and knees were physical impairments that substantially limited one or more major life activities of Plaintiff including, but not limited to, working, walking, sleeping, breathing, etc. These physical impairments are disabilities as defined by the ADA.

134.    While Plaintiff was limited in several major life activities, Plaintiff was able to perform the essential functions of his position as a physician with or without reasonable accommodation.

135.    Under Plaintiff's Employment Agreement, he was entitled to "participate in any group health care and dental program, pension or other benefit plans that company generally offers to other similarly situated full time physician employees subject to the terms of the plan documents and applicable federal and state law requirements". (See Exhibit A, ¶9(A))

136.    Additionally, Plaintiff was entitled to take reasonable time off for vacation and illness. (See Exhibit A, ¶9(B))

137.    During the time that Plaintiff was off due to a disability, the Defendants TriHealth and TriHealth Physicians reduced Plaintiff's salary for his inability to generate wRVUs. TriHealth Physicians' and TriHealth's actions were discriminatory and in violation of the ADA. Additionally, upon information and belief, Plaintiff is unaware of any other physician employed by TriHealth Physicians and TriHealth whose pay has been reduced for taking time off due to a disability.

138.    The actions of TriHealth Physicians and TriHealth violated the ADA and as a result Plaintiff is entitled to all remedies as provided under that statute.

139.    On July 25, 2018, Plaintiff filed a charge of discrimination alleging disability discrimination against the Defendants. The EEOC has issued a right to sue letter, a copy of which is attached as Exhibit K.

## COUNT XII
### (Handicap Discrimination in Violation of Ohio Revised Code §4112.02(A) and §4112.99
### Against TriHealth and TriHealth Physicians)

140.    Plaintiff realleges the allegations contained in paragraphs 1 through 139 as if fully rewritten herein.

141.    The illness and injury to Plaintiff's heart and knees resulted in Plaintiff being handicapped. As a result of the foregoing actions set forth in paragraphs 132-139, TriHealth Physicians and TriHealth violated Ohio Revised Code ¶4112.02(A) due to Plaintiff's handicap.

142.    As a direct and proximate result of TriHealth Physicians' and TriHealth's unlawful conduct, Plaintiff is entitled to all damages and relief as set forth in Ohio Revised Code §4112.99.

**WHEREFORE,** Plaintiff demands judgment against defendants, jointly and severally for the acts complained of in this amended complaint, in an amount to be determined at trial, but believed to be in excess of sixty million ($60,000,000) dollars, for both prejudgment and post-judgment interest, backpay, front pay, compensatory and punitive damages and reasonable attorney's fees, trial by jury, and any other additional relief to which he may be entitled.

Respectfully submitted,

/s/   Mark J. Byrne
**MARK J. BYRNE (0029243)**
**KENNETH F. SEIBEL (0025168)**
Trial Attorneys for Plaintiff
JACOBS, KLEINMAN, SEIBEL & McNALLY, LPA
Cincinnati Club Building
30 Garfield Place, Suite 905
Cincinnati, Ohio  45202
Phone: (513)  381-6600
Fax:     (513)  381-4150
E-mail:  mbyrne@jksmlaw.com
            kseibel@jksmlaw.com

<u>JURY DEMAND</u>

Plaintiff hereby demands a trial of all issues by a jury.

/s/ Mark J. Byrne
**MARK J. BYRNE (0029243)**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on January 8, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Richard L. Moore, Esquire
Matthew O. Wagner, Esquire
Frost Brown Todd LLC
3300 Great American Tower
301 East Fourth Street
Cincinnati, Ohio 45202
Rlmoore@fbtlaw.com
mwagner@fbtlaw.com
*Attorneys for TriHealth, Inc.*
*and TriHealth G, LLC dba*
*TriHealth Physicians Partners*

Dana E. Stutzman, Esquire
Jake B. Kolisek, Esquire
Hall, Render, Killian, Heath & Lyman, P.C.
500 N. Meridian Street, Suite 400
Indianapolis, IN 46204
dstutzman@hallrender.com
jkolisek@hallrender.com

David A. Eberly, Esquire
Eberly McMahon Copetas LLC
2321 Kemper Lane, Suite 100
Cincinnati, Ohio 45206
deberly@emclayers.com

*Attorneys for Mayfield Clinic, Inc.*

/s/ Mark J. Byrne
**MARK J. BYRNE (0029243)**
Attorney for Plaintiff