**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | |
|---|---|
| SET SHAHBABIAN, M.D., | Case No. 1:18-cv-790 |
| Plaintiff, | |
| | Dlott, J. |
| v. | Bowman, M.J. |
| TRIHEALTH, INC., et al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

On November 14, 2018, Plaintiff Set Shahbabian, M.D., filed suit against Defendants Trihealth, Inc., Trihealth G, LLC doing business as TriHealth Physician Partners (jointly referenced as "TriHealth), and Mayfield Clinic, Inc. ("Mayfield"). The case has been referred to the undersigned magistrate judge for ruling on all non-dispositive motions, and for a report and recommendation on any dispositive matters. (Doc. 3). Presently pending before the undersigned is a non-dispositive discovery dispute, initially presented by the parties through an informal telephonic conference held on September 3, 2019. For the reasons discussed below, the undersigned will compel TriHealth to additionally respond to Plaintiff's written requests for production of documents.

**I.    Background**

In his first amended complaint, Plaintiff alleges that TriHealth discriminated against him based upon his age and conspired with Mayfield "to fraudulently destroy the medical practice of a pre-eminent and long standing physician." (Doc. 21, Amended Complaint at 1). Plaintiff generally alleges that he practiced as a solo neurosurgeon on the west side

1

of Cincinnati. When he was approximately 70 years old, Plaintiff and TriHealth LLC signed a five-year Employment Agreement. (*Id.* at ¶¶11-12). Plaintiff alleges that shortly thereafter, TriHealth and Mayfield conspired to eliminate Plaintiff's neurosurgery practice by alleging that he was too old to perform surgery, and by falsely raising quality issues concerning his surgical competency. (*Id.* at 5-6). Plaintiff further alleges that TriHealth wrongfully directed new neurosurgery patients to Mayfield instead of Plaintiff, "deceitfully" limited his neurosurgical privileges, required him to consult with Mayfield physicians before performing surgery, and "deceptively" claimed that he had experienced surgical complications in order to transition Plaintiff's surgical practice to Mayfield. (*See generally*, *id.* at 8-12).

Plaintiff's 31-page amended complaint sets forth a dozen claims: breach of contract against TriHealth (Count I), federal age discrimination and retaliation under the ADEA against TriHealth (Counts II and III), related state law age discrimination and retaliation claims against TriHealth (Counts IV-VI), a state law "aiding and abetting " claim against all Defendants (Count VII), common law fraud against TriHealth (Count VIII), a tortious interference with his employment contract claim against Mayfield (Count IX), a common law civil conspiracy claim against all Defendants (Count X), a federal disability discrimination claim under the ADA against TriHealth (Count XI), and a related "handicap discrimination" claim under state law (Count XII). Plaintiff seeks monetary damages in excess of sixty million dollars. (*Id.* at 31).

TriHealth and Mayfield filed answers that assert numerous affirmative defenses. (Docs. 23, 24). In addition to its affirmative defenses, TriHealth's answer includes a counterclaim seeking a declaratory judgment that the parties' Employment Agreement "is

valid and enforceable and that pursuant to the Agreement, Shahbabian is obligated to reimburse TriHealth for any overpayment he received during his employment with TriHealth…." (Doc. 24 at 13). As of February 28, 2018, TriHealth G, LLC alleges that Shahbabian owes his employer the sum of $605,254.57, which he is required to repay upon his separation from TriHealth G, LLC for any reason. (*Id.* at 15).

Fact discovery is scheduled to conclude by December 2, 2019, with a dispositive motion deadline of January 10, 2020. (Doc. 29). The parties have enlisted the Court's assistance with several discovery disputes to date. In addition, a telephonic conference concerning a new dispute is set for October 9, and Defendant Mayfield has filed a formal motion to quash and for a protective order concerning a recently issued subpoena. (Doc. 74).

On September 3, 2019, the undersigned held a telephonic discovery conference in attempt to resolve an earlier dispute over the production of documents as to which the TriHealth Defendants claim attorney-client privilege. Following the conference, the undersigned directed TriHealth to produce the documents *in camera* for closer inspection as to the applicability of the asserted privilege. In accordance with the Court's directive, TriHealth produced the documents *in camera*, together with a four-page *Ex Parte* letter that sets forth legal argument as to why TriHealth believes documents relating to its fair market value analyses are protected by privilege.[1]

---

[1] The production of documents made to this Court *in camera* does not contain any form of privilege log, and reflects redactions of most physician names. Given the privacy interests of non-parties, the redaction of names (other than possibly Plaintiff's own) is not necessarily problematic. However, a more significant issue is that the documents were produced to the Court and identified as falling within three broad categories, but not otherwise identified by a "bates number" or other system. TriHealth states that it is working with outside counsel in order to confirm "whether any additional, non-duplicative documents exist" that were not included in the *in camera* production. The undersigned has included minimal quotations from the Defendants' *Ex Parte* letter within the body of this Order, and has directed TriHealth to disclose the full contents of the letter because it does not appear to contain any confidential or privileged information.

3

II. Analysis

A. Attorney-Client Privilege Under Federal Law

The Court applies federal law regarding privilege because Plaintiff invokes federal question jurisdiction, notwithstanding his supplemental state law claim. *Hancock v. Dodson*, 958 F. 2d 1367, 1373 (6th Cir. 1992). However, "[t]here is no material difference between Ohio's attorney-client privilege and the federal attorney-client privilege." *MA Equip. Leasing I, L.L.C. v. Tilton*, 980 N.E.2d 1072, 1079-80 (Ohio App. 2012).

The attorney-client privilege is intended to encourage full and open communication between clients and their attorneys. *Upjohn Co. v. U.S.*, 449 U.S. 383, 389 (1981); *In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996). However, claims of attorney-client privilege will be narrowly construed because they "reduce[] the amount of information discoverable during the course of a lawsuit." *Humphreys, Hutcheson and Moseley v. Donovan*, 755 F.2d 1211, 1219 (6th Cir.1985) (quoting *United States v. Goldfarb*, 328 F.2d 280, 281 (6th Cir.), *cert. denied*, 377 U.S. 976, 84 S.Ct. 1883 (1964)). Thus, courts apply the privilege "only when 'necessary to achieve its purpose' and only to protect legal disclosures that 'might not have been made absent the privilege.'" *Cooey v. Strickland,* 269 F.R.D. 643, 648 (S.D. Ohio 2010) (quoting *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569 (1976)).

Although the essence of the privilege is to protect confidential communications between a lawyer and a client, it may also apply to agents of a lawyer who are employed in order to provide legal advice. "The privilege applies to factual investigations conducted by counsel at a corporate client's request (to provide legal advice to that client), and also to agents of an attorney who are assisting in rendering legal advice to the client." *In re*

4

*Behr Dayton Thermal Products, LLC*, 298 F.R.D. 369, 373 (S.D. Ohio 2013) (internal citation omitted). To assess whether the privilege applies in any given situation, the Sixth Circuit has instructed courts to review the following criteria:

> (1) Where legal advice of any kind is sought (2) from a professional legal advisor in his [or her] capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself [or herself] or by the legal advisor, (8) unless the protection is waived.

*Reed v. Baxter*, 134 F.3d 351, 355-56 (6th Cir. 1998) (additional citation omitted).

No matter what, in order to be privileged, "communications between non-attorney corporate employees must be made in order to secure legal advice from counsel." *Upjohn Co. v. United States*, 449 U.S. 383, 394, (1981). Thus, to establish that a document is protected under the attorney-client privilege, Defendants must prove that the "dominant intent" of the communication was to secure "legal advice from [a] lawyer." *See Behr Dayton Thermal Prod.'s, LLC*, 298 F.R.D. at 375 (quoting *Comtide Holdings, LLC v. Booth Creek Mgmt. Corp.*, 2010 WL 5014483, *2 (S.D. Ohio 2010)). As the party asserting the privilege, TriHealth has the burden of proving its applicability. *United States v. Krug*, 379 Fed. Appx. 473, 478 (6th Cir. 2010); *see also* Fed. R. Civ. P. 26(b)(5).

### B. Documents at Issue

The employment contact at issue specifically states that Plaintiff's compensation must be "consistent with fair market value" ("FMV"). Although the contract undoubtedly was based upon multiple business considerations, the precise terms – including the reference to FMV - reflect the reality that healthcare is a highly regulated industry. At least two federal laws, known as the "Stark Act" and the "Anti-Kickback law" apply to healthcare providers and systems. These laws generally are intended to prevent fraud,

self-referrals, and financial kickbacks, including but not limited to the context of Medicare and Medicaid reimbursements. In order to comply with these laws, health care systems are required to ensure that the compensation paid over the term of a physician employment agreement is "consistent with fair market value." *See* 42 U.S.C. § 1395nn(e)(7).

In the physician compensation context, the assessment of FMV is often expressed as a salary range as compared to other physicians with similar skills performing similar services. *See generally*, *United States ex rel. Bookwalter v. UPMC*, ___ F.3d ___, 2019 WL 4437732, at *1 (3rd Cir., Sept. 17, 2019) (noting that relators in False Claims Act case alleging Stark Law violations alleged that neurosurgeons' pay exceeded 90% percentile); *see also generally U.S. ex rel. Schaengold v. Memorial Health, Inc.*, 2014 WL 7272598 at *5-6, 12 (S.D. Ga. Dec. 18, 2014) (discussing market value of compensation by reference to percentiles). In *Bookwalter*, the Third Circuit explained how the Stark Act operates to prevent Medicare fraud when a billing hospital has a financial relationship with referring physicians, and how FMV physician compensation works to insulate hospitals and physicians from running afoul of that law. Despite the difference in the False Claims Act claims presented, the Third Circuit's analysis provides useful context:

> When doctors refer patients to hospitals for services, the hospitals make money. There is nothing inherently wrong with that. But when hospitals pay their doctors based on the number or value of their referrals, the doctors have incentives to refer more. The potential for abuse is obvious and requires scrutiny.
>
> The Stark Act and the False Claims Act work together to ensure this scrutiny and safeguard taxpayer funds against abuse. The Stark Act forbids hospitals to bill Medicare for certain services when the hospital has a financial relationship with the doctor who asked for those services, unless an exception applies.

*United States ex rel. Bookwalter v. UPMC*, ___ F.3d ___, 2019 WL 4437732, at *1 (3rd Cir., Sept. 17, 2019) As *Bookwalter* noted, many innocuous and common billing relationships potentially run afoul of the Stark Act. For that reason, the law lists exceptions, on which the healthcare provider generally bears the burden of proof, including an exception for physicians who are compensated at "fair market value."

> All four exceptions have two elements in common. First, the doctor's compensation must not "take[ ] into account (directly or indirectly) the volume or value of" the doctor's referrals. 42 U.S.C. § 1395nn(e)(2)(B)(ii); *accord id.* § 1395nn(e)(3)(A)(v); 42 C.F.R. § 411.357(*l*)(3), (p)(1)(i). Second, the doctor's compensation must not exceed *fair market value*. 42 U.S.C. § 1395nn(e)(2)(B)(i), (e)(3)(A)(v); 42 C.F.R. § 411.357(*l*)(3), (p)(1)(i).

*Bookwalter*, 2019 WL 4437732, at *4.

Plaintiff alleges that his 2014 contract with TriHealth is based upon a metric defined as a work relative value unit (wRVU). Plaintiff argues, and TriHealth does not dispute, that TriHealth's counterclaim is based in part upon TriHealth's assertion that the decrease in Plaintiff's wRVU contractual performance required Plaintiff to reimburse TriHealth because otherwise his compensation would be above FMV and in violation of the Stark Act. In other words, TriHealth's counterclaim rests in part upon its assessment of FMV and consequences that flow from the contractual arrangement under federal law. Plaintiff therefore seeks the production of documentation relating to FMV determinations of both his compensation during the formation of the 2014 contract and any subsequent related FMV determinations. It appears that those FMV determinations were made by non-attorney accounting and valuation consultants at the request of both corporate general counsel and/or outside counsel. Both corporate counsel and outside counsel were asked

7

to render one or more opinions on the FMV of physician compensation, among other contractual issues related to the negotiation of Plaintiff's contract.

Defendants contend that the documents are privileged because laws and regulations such as the Stark law and Anti-Kickback laws transform any assessment of a physician's FMV from a strictly contractual matter involving business considerations into "a legal question with significant ramifications for healthcare providers." (*Ex Parte* letter). In support of its position that all FMV communications were made for the <u>primary</u> purpose of seeking legal advice, TriHealth points to a "Special Advisory Bulletin" dated June 2001 from the Department of Health and Human Services, Office of the Inspector General, in which the OIG suggested that "use of an outside consultant alone does not shield a healthcare provider from liability for violating [the] Stark Law." (*Ex Parte* letter, citing www.oig.hhs.gov/fraud/docs/alertsandbulletins/consultants.pdf). Thus, TriHealth argues that it sought "legal advice" on FMV, as suggested by the OIG bulletin, in order to ensure regulatory compliance.

However, the cited OIG bulletin does not support TriHealth's position that any and all analysis of FMV constitutes "legal advice" subject to attorney-client privilege. Instead, the bulletin merely warns providers against over-reliance on all types of "questionable" consulting practices by unscrupulous consultants, including "accountants, attorneys, business advisors, and reimbursement specialists." *Id.* The bulletin warns that reliance on any consultant who promises specific results that are clearly unreasonable or improbable will not insulate a healthcare provider from liability. The bulletin includes numerous examples, among them an example of a "valuation consultant promising or assuring a client that its appraisal of a physician's practice will yield a 'fair market value'

that satisfies the client's need for a *particular valuation, regardless of the actual value of the practice.*" *Id.* (emphasis added). In short, the OIG bulletin warns health care providers that they can be held liable if they rely upon an unscrupulous consultant who employs questionable practices – regardless of whether that consultant is an attorney or an accountant. The bulletin does not define FMV as strictly a legal determination nor does it state or imply that a provider should seek out a lawyer (as opposed to an accountant or "valuation consultant") to make FMV compliance determinations. The undersigned is not concluding that the assessment of FMV is always independent of "legal advice," but rather, is merely pointing out that an FMV determination may or may not be not subject to an attorney-client privilege.

In the case presented, TriHealth identifies three separate categories of documents that relate to FMV compliance determinations, and as to which it claims attorney-client privilege. First, it represents that in 2014, its Chief Operating Officer[2] engaged an outside valuation consultant to provide an FMV opinion concerning Plaintiff's contractual compensation. That same opinion was also provided to TriHealth's counsel, who was advising TriHealth on contractual negotiations with Plaintiff – a topic that inherently encompassed both business and legal considerations. The related documents are identified as "Category 1" in TriHealth's *Ex Parte* letter to the Court. TriHealth subsequently performed a "system-wide review" of the FMV of physician salaries in the TriHeatlh Orthopedic & Sports Institute, which included Plaintiff, in 2017. TriHealth conducted that review by employing an outside law firm, which in turn engaged an outside

---

[2] The C.O.O. possessed a J.D. among other credentials, but it does not appear that TriHealth is asserting that she acted as counsel.

valuation (non-lawyer) consultant to perform the FMV analysis prior to reporting its analysis to counsel. (Category 2).

Category 3 in TriHealth's *Ex Parte* letter is described as documents relating to FMV that may have occurred with regard to the 2014 Co-management Agreement between TriHealth and Mayfield,[3] as well as documents relating to the renegotiation of the Co-Management Agreement in 2017 and related FMV review for all payments made to Mayfield and/or Mayfield physicians under the 2017 Co-Management Agreement. Outside counsel engaged a non-lawyer consultant called Navigant to provide services relating to the FMV opinions, and the opinions "may have been shared" with an "agent" of TriHealth called Chartis, which was "handling negotiations" between TriHealth and Mayfield at that time.[4]

In support of its assertion that any and all documents in the three categories (relating in any manner to FMV physician compensation issues) are shielded from discovery by the cloak of attorney-client privilege, TriHealth cites *Graff v. Haverhill North Coke Co.*, Case NO. 1:09-cv-670, 2012 WL 5495514 at **9-10 (S.D. Ohio Nov. 13, 2012). In that case, Magistrate Judge Litkovitz was called upon to determine whether attorney-client privilege could be claimed for an environmental consulting report. Judge Litkovitz held that because a memo directed in-house counsel "to obtain an [environmental] audit and provide legal advice on [Defendant's] compliance with regulatory matters," the record

---

[3] TriHealth states that it no longer possesses these documents.

[4] By way of example, an email from a consultant at Chartis dated 12/8/16 to attorneys Steve Gracey and Catherine Dunley discusses multiple "materials that we have shared with Mayfield over the business planning process," and refers to discussions of "facilities planning, marketing, the neuro-intensivist program, and QI/program development" as well as discussions about building "clinical expertise, technology/infrastructure, and administrative support necessary to sustain a high-performing, regional neurosciences program." Despite being an email directed to counsel, the primary purpose of the referenced email appears to have been to communicate about Chartis's business planning meetings, and not for the purpose of seeking legal advice from TriHealth's counsel.

10

clearly established that the audit "was obtained by SunCoke for the express purposes of assisting its counsel in providing legal advice on environmental compliance matters" and thus was fully protected by the asserted attorney-client privilege. Applying *Graff* broadly, TriHealth could claim attorney-client privilege for any documentation from any type of consultant, so long as the consultant was engaged by or provided information to an attorney (whether corporate or outside counsel), and as long as counsel was retained (at least in part) to assist with regulatory compliance. Given the varied business and regulatory purposes of FMV analysis of physician compensation in the highly regulated industry of healthcare, the undersigned must respectfully disagree with the breadth of the *Graff* analysis in this particular context. Such a broad reading of *Graff* also runs counter to the basic principle that privileges should be construed narrowly, and that much of the underlying accounting "factual" data is not privileged. *But see In re Behr Dayton Thermal Products, LLC*, 298 F.R.D. at 374 (declining to require production of contested documents where the Court concluded "that any nonprivileged factual information contained therein may be obtained by other means, including depositions and interrogatories.")

As discussed *infra*, FMV valuations of physician compensation may become the subject of False Claims Act litigation involving alleged violations of the Stark Act. Although FMV valuations often take center stage in those cases, it is worth repeating that TriHealth does not dispute that the FMV valuation is highly relevant to Plaintiff's breach of contract claim, as well as to TriHealth's affirmative defense and counterclaim. In the False Claims Act context, courts have held that the attorney-client privilege does <u>not</u> extend to the accounting documents and data that underlie the FMV analysis of physician compensation. The cases appear to conclude that the materials simply are not subject

to the privilege, and not that any asserted privilege is waived based on the central issues in dispute.[5]  *See e.g.*, *United States of America Ex Rel Rembert v. Bozeman Health Deaconess Hospital*, 2018 WL 2320645 (D. Mont. May 22, 2018) (consultant's FMV valuation work); *United States Ex Rel Baklid-Kunz v. Halifax Hospital Med. Center*, 2012 WL 5415108 (M.D. Fla. Nov. 6, 2012) (compelling disclosure of all documents and/or communications that relate to fair market value determinations or analyses with respect to physician compensation, including drafts*); but see Heartland Surgical Specialty Hosp., LLC v. Midwest Division, Inc.*, 2007 WL 2122440 at *4 and n. 5 (D. Kan. 2007) (holding that surgical group failed to make a "clear showing" that privilege applied, but reasoning that accounting firm did no more than gather data from surgical group's policies, procedure, and job descriptions and compare that data to data of other companies as opposed to performing a "complex accounting procedure or an in-depth fair market analysis and…analysis of either Stark or the anti-kickback laws").

In conducting an *in camera* review of the referenced categories of documents, the undersigned cannot agree that the <u>primary</u> purpose and/or dominant intent of <u>all</u> referenced documents was to seek legal advice. *See Upjohn*, 449 U.S. at 394, 101 S.Ct. 677.  Although some documents may remain within the scope of the privilege if primarily intended to secure legal advice, other documents are primarily focused on business considerations, or reference only nonprivileged underlying FMV data.

The fact that the underlying accounting and valuation data was shared with counsel for use in the contract negotiations does not alone create a privilege for the data.

---

[5] Here, Plaintiff has argued only that the documents are not subject to the attorney-client privilege, and also has not asserted waiver based upon TriHealth's assertion of a counterclaim that places the FMV valuation "at issue." *Contrast U.S. ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 391 and n.8 (4th Cir. 2015) (discussing waiver when defendant relied upon "advice of counsel" defense in context of False Claims Act fraud claim).

*See Waters v. Drake*, No. 2:14-CV-1704, 2015 WL 8281858, at *4 (S.D. Ohio Dec. 8, 2015) (where the dominant purpose of such communications is not to secure legal advice or information requested by counsel, but to make some type of policy or business decision, the communication cannot be insulated from discovery just by sending a copy of it to a lawyer). As the Sixth Circuit has explained:

> The attorney-client privilege only precludes disclosure of *communications* between attorney and client and does not protect against disclosure of the facts underlying the communication. *Upjohn Co. v. United States,* 449 U.S. 383, 395, 101 S.Ct. 677, 685, 66 L.Ed.2d 584 (1981). In general, the fact of legal consultation or employment, clients' identities, attorney's fees, and the scope and nature of employment are not deemed privileged.

*Humphreys*, 755 F.2d at 1219. *See also generally, Neuder v. Battelle Pacific Northwest Nat. Laboratory*, 194 F.R.D. 289, 295 (D.D.C. 2000) ("documents prepared by non-attorneys and addressed to non-attorneys with copies routed to counsel are generally not privileged since they are not communications made primarily for legal advice"). The undersigned recognizes that in many scenarios involving communications with corporate counsel, the persons communicating with counsel may be seeking advice on the potential legal ramifications of a business decision. However, "where 'the evidence equally supports an inference that the communication either was, or was not, related to the subsequent request for legal advice,' the Court must rule in the challenging party's favor." *In re Behr Dayton Thermal Prod.*, 298 F.R.D. at 375 (quoting *Comtide Holdings, LLC*, 2010 WL 5014483 at *3).

In sum, the undersigned concludes that TriHeatlh has failed to satisfy its burden of proving that the entire body of documents submitted *in camera* are subject to the asserted attorney-client privilege. At the same time, it is not entirely clear to the undersigned that all of the documents should be disclosed. Even where not subject to privilege, it is readily

apparent that many of them contain highly confidential and/or proprietary information that would fall within the parties' existing protective order. Based on the ambiguities that remain and in order to conserve judicial resources, this Order provides general guidance and requires TriHealth to provide a privilege log for all other documents that TriHealth elects to continue to withhold from disclosure. *See Cooey v. Strickland*, 269 F.R.D. at 649 (requirements of privilege log). After production of the referenced documents and privilege log, the parties are strongly encouraged to re-employ their best efforts to resolve any remaining disputes concerning the subject documents.

### III. Conclusion and Order

Accordingly, **IT IS ORDERED:**

1. Plaintiff's oral request of September 3, 2019, to direct TriHealth to produce additional discovery documents, is granted in part based upon this Court's preliminary *in camera* review;

2. Underlying factual valuation consulting data and correspondence concerning FMV determinations from Navigant and/or Chartis are not subject to the attorney-client privilege and should be disclosed assuming they are both relevant and responsive to Plaintiff's requests;

3. The *Ex Parte* letter from TriHealth's counsel to this Court, asserting the privilege, also should be disclosed to Plaintiff's counsel;

4. In lieu of directing the disclosure of *all* documents, and in recognition that some may remain subject to attorney-client privilege, TriHealth shall provide to Plaintiff's counsel, on or before **October 15, 2019,** a privilege log and/or corresponding improved identification of the referenced documents (whether

by bates number or through reference to dates, subject matter and author/recipient).  Following such production, the parties shall endeavor to resolve any remaining dispute concerning the production of any documents as to which TriHealth continues to assert attorney-client privilege.

*s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge