**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION – CINCINNATI**

| | | |
|---|---|---|
| SET SHAHBABIAN, M.D., | : | Case No. 1:18-cv-790 |
| | : | |
| Plaintiff, | : | Judge Matthew W. McFarland |
| | : | |
| v. | : | |
| | : | |
| TRIHEALTH, INC., et al., | : | |
| | : | |
| Defendants. | : | |

———————————————————————————————————————————

**MEMORANDUM OPINION AND ORDER**

———————————————————————————————————————————

The parties to this lawsuit are all medical entities. Plaintiff Set Shahbabian, M.D., is a neurosurgeon. Defendants TriHealth, Inc., and TriHealth G, LLC, d/b/a TriHealth Physician Partners (collectively, TriHealth) are part of a health system based in Cincinnati, Ohio. Defendant Mayfield Clinic, Inc., is a physician group that provides brain and spine care at most Cincinnati hospitals, including ones that are affiliated with TriHealth. These parties have each filed a motion for summary judgment (Docs. 136, 137, and 138). Their three motions have been fully briefed and are now ripe for the Court's review.

**FACTS**

Dr. Shahbabian set up an independent solo practice in 1985. (Shahbabian Dep. 14, Doc. 181 at Pg. ID 13148.) For many years, he primarily exercised surgical privileges at Good Samaritan Hospital. Good Samaritan is a TriHealth facility. (Oliphant Dep. 50, Doc. 165 at Pg. ID 10988.) By one account, he performed half of the neurosurgical cases

1

at that hospital. (Kerlakian Dep. 33, Doc. 175 at Pg. ID 12526.)

TriHealth and Mayfield had an agreement to work together to oversee the quality of TriHealth's neuroscience program. (Ringer Dep. 51, Doc. 171 at Pg. ID 11635; Pl. Ex. 20., Doc. 171-20 at Pg. ID 11932.) Under that agreement, Mayfield physicians served on TriHealth's quality assurance and peer review programs. (Pl. Ex. 20, Doc. 153-13 at Pg. ID 9024, 9051.) It also established a panel of physicians who would work at certain hospitals, like Good Samaritan. (Farrington Dep. 100, Doc. 153 at Pg. ID 8842.) One of those physicians, Andrew Ringer, M.D., a Mayfield doctor, served as the section chief of neurosurgery and chief of neurosciences at Good Samaritan. (Ringer Dep. 10-11, Doc. 171 at Pg. ID 11594-95.)

Good Samaritan used its quality review process to review, among other things, complications that arose during surgery. That process works like this: A nurse Clinical Quality Specialist reviews patient records according to pre-established criteria. The nurse flags quality of care concerns, like unexpected complications or excessive blood loss. After the nurse's review, the Section Chief and Department Head reviews the patient's chart. That person might close the case, or send a Letter of Inquiry to the physician, asking questions about the quality of care provided. The physician's responses become part of the file. If the review process continues, the Quality Assurance Committee ("QAC" or "Quality Committee") reviews the matter. Each department has its own QAC. And each QAC has a head. The heads of all the QACs comprise the Patient Care Committee ("PCC"). After review by the QAC, the PCC oversees and either affirms or rejects the results of the departmental QAC's recommendations. (Koselka Dep. 71, Doc.

2

173 at Pg. ID 12232.)  The Quality Review process either results in a closed case or the assignment of a Case Weight (or Case Level) of 1, 2, or 3.  Case Weight 1 is an "improvement opportunity."  Case Weight 2 is "at risk behavior."  And Case Weight 3 is "reckless behavior or recurrent at-risk behavior."  (Doc. 137 at 3 fn. 7.)  A physician may appeal a negative Case Weight.  (Shahbabian Dep. 127, Doc. 181 at Pg. ID 13261.)

Dr. Shahbabian's surgical outcomes triggered recurring quality review investigations.  For instance, in December 2009, a patient was scheduled for operation on the C5-C6 level of the spine.  But Dr. Shahbabian operated on the C6-C7 level. Afterwards, he proceeded to operate on the scheduled level.  This resulted in a Case Weight 1.  (Shahbabian Dep. 119, Doc. 181 at Pg. ID 13253; Def. Ex. 40, Doc. 164-2 at Pg. ID 10715-18.)  On another occasion, after a November 2011 surgery, Dr. Shahbabian's patient suffered paralysis and later died.  The PCC assigned a Case Weight 3. (Shahbabian Dep. 130, Doc. 181 at Pg. ID 13264; Def. Ex. 46, Doc. 164-3 at Pg. ID 10719-27.)  And, in January 2013, Dr. Shahbabian received a Case Weight 2 for a patient's excessive blood loss.  (Shahbabian Dep. 133, Doc. 181 at Pg. ID 13267; Def. Ex. 48, Doc. 164-4 at Pg. ID 10728-33.)

The "demands of the business end of things were getting to him," according to Dr. George Kerlakian, based on conversations he had with the doctor.  (Kerlakian Dep. 44, Doc. 175 at Page ID 12537.)  Throughout his career, Dr. Shahbabian operated on four hours of sleep.  (Shahbabian Dep. 220-21, Doc. 181-1 at Page ID 13354-55.)  Once, in January 2014, he fainted in the operating room.  (*Id*. at 143, Doc. 164-1 at Pg. ID 10676.) His annual salary had been declining.  (*Id*. at 52, Doc. 181 at Pg. ID 13186.)  His patients

3

worried about who would see them after he retired. (*Id.* at 250, Doc. 181-1 at Pg. ID 13384.) He attempted to persuade younger doctors to join him as solo practitioners to divide office expenses. No one did. (*Id.* at 33, Pg. ID 13167-72; 13175-76.)

So, at 70 years old, he began negotiating an employment contract with TriHealth. (*Id.* at 195, Pg. ID 13329.) The employment agreement ("the Agreement") they eventually agreed upon provided for a five-year term, beginning on May 1, 2014. Neither party had any obligation to the other after five years. (*Id.* at 55, Pg. ID 13188-89.) In addition to securing his employment, TriHealth bought his solo practice and assumed all of its obligations, including personnel, invoicing, and facility maintenance. (*Id.* at 48, Page ID 13182; Def. Ex. 3, Doc. 181-2 at Page ID 13523; Doc. 186-10.)

The Agreement provided Dr. Shahbabian with an annual income of $968,000 for completing a baseline production of 24,207 work Relative Value Units, or wRVUs. (Shahbabian Dep. 59, 285, Doc. 181-1 at Pg. ID 13193, 13419; Doc. 181-2 at Pg. ID 13663.) wRVUs measure the value of the procedures that physicians perform. (Ringer Dep. 57, Doc. 171 at 11641.) The Agreement also gave him a three-year period of income protection, up to April 30, 2017. That meant that, even if he did not meet his wRVU standard, his salary was protected. After that three-year period, if he failed to meet his wRVU production requirement, he would be paid according to the wRVUs he generated. (Oliphant Dep 51-52, Doc. 165 at Page ID 10989-90.)

Quality of care concerns continued after he started working for TriHealth. In the spring of 2015, he received three separate Case Weight 3s for "reckless behavior." The Quality Committee defines "reckless behavior" as "a behavioral choice to consciously

4

disregard a substantial or unjustifiable risk that breaches the practitioner's duty to the patient." (E.g., Doc. 164-6 at Page ID 10792.) The first Case Weight 3 was for his repeated use of an improper antibiotic. (Def. Ex. 55, Doc. 164-6, Page ID 10740-46; 164-12 at Page ID 10875.) The second was for failing to seek additional physician assistance when complications arose and for failing to use a microscope. (Def. Ex. 56, Doc. 164-6 at Page ID 10766.) The third was related to the absence of securing lumbar drain placement before the patient's operation. (Def. Ex. 57, Doc. 164-6 at Page ID 10792.) He had the right to appeal these decisions under applicable bylaws, but he did not do so. (Shahbabian Dep. 148, Doc. 181 at Page ID 13282.)

Based on the Quality Committee's findings, Dr. Shahbabian received a formal plan of correction. The correction plan changed certain areas of his surgical practice. It limited his daily surgical block to six hours. The Neurosurgery Section Chair would conduct pre-operative reviews of his intra-cranial cases. He would no longer perform spinal decompression cases exceeding three levels, multi-level fusions, or revisions. And, when issues arose during an operation, he would have to consult an associate neurosurgeon. (*Id.* at 63, Pg. ID 13198; Def. Ex. 17, Doc. 181-2 at Page ID 13670.) This formal correction plan went into his peer review file. (*See* handwritten note at *id.*)

Shortly after he received the correction plan, Dr. Shahbabian negotiated an amended employment agreement ("Amended Agreement") with TriHealth. (Shahbabian Dep. 63, Doc. 181 at Pg. ID 13197.) The Amended Agreement took the correction plan's restrictions into account. (*Id.*) He signed it in July 2015. (Def. Ex. 17, Doc. 181-2 at Pg. ID 13668.) His required wRVU production rate decreased to 11,700, but

5

his salary remained the same. (Def. Ex. 18, Doc. 181-2 at Pg. ID 13673; Def. Ex. 19, Doc. 181-2 at Page ID 13677; Shahbabian Dep. 63, Doc. 181 at Pg. ID 13197.)

By Fall 2016, TriHealth was anticipating that a succession plan for Dr. Shahbabian's patients might be necessary. Dr. Zachary Tempel was identified as a possible replacement for some of Dr. Shahbabian's patients. (Pl. Ex. 223, Doc. 152-45, Pg. ID 8412; Pl. Ex. 62, Doc. 153-29, Pg. ID 9119.) During a conversation (which he recorded) with Dr. Robert Collins and Dr. Kerlakian on October 31, 2016, Dr. Shahbabian advised that he had "more than enough" surgical cases. (Doc. 181-3 at Page ID 13831; Shahbabian Dep. 245, Doc. 181-1 at Page ID 13379.) He said that, after May 2017, he would "slow down" and "[Mayfield] can take over at that point." (Doc. 181-3 at Pg. ID 13833; Shahbabian Dep. 247, Doc. 181-1 at Pg. ID 13381.) They asked if he wanted to "start a process where we actually decrease your operative experience," with Dr. Shahbabian staying on to help with other tasks such as teaching residents. (Doc. 181-3 at Pg. ID 13833; Shahbabian Dep. 247, Doc. 181-1 at Pg. ID 13381.) He liked the prospect of teaching residents, but noted that things were more complicated with his office—he would have to gradually work until May 2019. (Doc. 181-3 at Pg. ID 13833.)

Not long after that meeting, Dr. Shahbabian's treatment of a patient triggered the peer review process again. (Def. Ex. 69, Doc. 164-8 at Pg. ID 10807.) The Quality Committee assigned a Case Weight 2 ("at risk behavior") in June 2017 for performing an unnecessary surgery. (*Id.* at Pg. ID 10814.) Then again, following a March 2017 treatment, a patient was left severely disabled with a spinal cord injury. (Ringer Dep. 230-31, Doc. 171 at Pg. ID 11814-15.) The Quality Committee assigned him another Case Weight 2

6

based on every reviewer's opinion that he operated on the patient using an unnecessary method. (Doc. 164-9 at Page ID 10831.)

On May 18, 2017, the Quality Committee met for their monthly Department of Surgery Quality Assurance ("QA") meeting. On their agenda were the two recent cases involving Dr. Shahbabian. The discussion "focused on the recurring concerns and quality issues related to Dr. Shahbabian's practice." (Pl. Ex. 69, Doc. 171-69 at Pg. ID 12152.) The committee members concluded that there was "enough concern that patient safety was in question and Dr. Shahbabian should not be operating." (*Id.*; Ringer Dep. 228-29, Pg. ID 11812-13.) Dr. Ringer, who was present at that meeting, later testified that "several members of the cervical QA committee expressed concern that I was so frequently presenting cases of Dr. Shahbabian's." (Ringer Dep. 229, Doc. 171 at Pg. ID 11813.) They were frustrated that "two previous focused correction plans had not prevented these outcomes and that they felt we were simply running into the same problem over and over and over again. And they were concerned about the safety of the patients being treated at Good Samaritan Hospital." (*Id.*)

After the Quality Committee meeting, Drs. Margaret LeMasters (the medical staff president), Helen Koselka, and Collins met with Dr. Shahbabian. They asked him to consider suspending his surgical activity. He refused. So they asked him to voluntarily refrain from operating on patients at least until they had obtained an outside review of his surgical cases. Dr. Shahbabian then called his office, canceled his surgeries, and agreed that he would not schedule any further cases, pending further review. (Def. Exs. 72, 74, Doc. 181-4 at Pg. ID 13863, 13866.)

But the next month, June 2017, Dr. Shahbabian sent a letter to Dr. LeMasters. He informed her that he had decided to "voluntarily relinquish my surgical privileges at The Good Samaritan Hospital." (Def. Ex. 78, Doc. 181-4 at Pg. ID 13874.) The next month, Dr. Tempel received temporary surgical privileges at Good Samaritan and began absorbing some of Dr. Shahbabian's patients. (Pl. Ex. 153, Doc. 155-23; Pl. Ex. 159, Doc. 155-29.)

Meanwhile, lawyers began negotiating another amended employment contract between Dr. Shahbabian and TriHealth. They discussed a possible transition for Dr. Shahbabian into a role where he would continue providing patient care but not doing surgeries. (Gracey Dep. 148, Doc. 151 at Pg. ID 7344.) TriHealth proposed that Dr. Shahbabian work as a neurosurgical hospitalist, performing rounds on inpatients. (Shahbabian Dep. 290, Doc. 181-1 at Pg. ID 13424.) The doctor found that idea insulting. Negotiations continued. In September 2017, TriHealth offered to amend the employment agreement to pay him an annual salary of $437,500.00 for non-surgical professional services. He rejected that offer too. (Gracey Decl. ¶ 3, Doc. 137-10 at Pg. ID 4265.)

During this time, Dr. Shahbabian was suffering from health issues and eventually had to use an electric scooter. In May 2017, he complained of high blood pressure and lightheadedness. (Doc. 164-1 at Pg. ID 10697, 10703.) In August 2017, he reported knee issues, malaise, fatigue, and gait abnormality. (*Id.*) In January 2018, he had a heart attack. He underwent open heart surgery. (Doc. 164-1 at Pg. ID 10698; Doc. 181 at Pg. ID 13147.) Four days later he was seeing patients. (Doc. 164-1 at Pg. ID 10698.) In April 2018, he was experiencing bouts of shortness of breath and light-headedness. (*Id.* at Pg. ID 10701.) His doctor concluded that his hypertension was uncontrolled, but Dr. Shahbabian

8

disagreed. (*Id.* at Pg. ID 10702.)

While Dr. Shahbabian and TriHealth were engaging in ongoing negotiations of additional amendments to his employment contract, his 2014 Employment Agreement (as amended in June 2015) remained in place. That meant his production standard of 11,700 wRVUs per year was also still in effect. (E.g., Doc. 137-9 at Pg. ID 4258.) But he was not meeting that standard. This prompted Dr. Robert Cercek to raise the issue of scaling back Dr. Shahbabian's compensation to match the amount of work he was doing. (Doc. 137-6 at Pg. ID 4197-4200.) To that end, TriHealth adjusted Dr. Shahbabian's salary downward, based on his estimated earned compensation. (Pl. Ex. 295, Doc. 162-17 at Pg. ID 10641; Doc. 157-18.) TriHealth did not renew its contract with Dr. Shahbabian after the employment agreement ended on May 1, 2019. (Def. Ex. 80, Doc. 181-4, Pg. ID 13876.) After TriHealth reconciled Dr. Shahbabian's compensation with his actual productivity, it sent him notice that he had been overpaid by $679,711.61. (Def. Ex. 81, Doc. 181-4 at Pg. ID 13877.)

This lawsuit is the result of these events. Dr. Shahbabian sued TriHealth and Mayfield on November 14, 2018. He has brought claims against TriHealth for breach of contract, common law fraud, and several claims of age discrimination, disability discrimination, retaliation. Against Mayfield, he alleges tortious interference with contract and prospective business relationships. And he accuses both TriHealth and Mayfield of aiding and abetting and common law civil conspiracy. (Doc. 21.) TriHealth filed counterclaims against Dr. Shahbabian for breach of contract and unjust enrichment. (Doc. 88.)

Now, Dr. Shahbabian, TriHealth, and Mayfield have all filed motions for summary judgment. Dr. Shahbabian claims he is entitled to summary judgment on TriHealth's counterclaim for unjust enrichment. TriHealth and Mayfield both claim they are entitled to summary judgment on all the claims brought against them. TriHealth further argues it is entitled to summary judgment on its breach of contract counterclaim.

## LAW AND ANALYSIS

### I

When there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law, the court shall grant summary judgment. Fed. R. Civ. P. 56(a). The moving party has the burden to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). If the moving party meets that burden, then it becomes the nonmoving party's responsibility to point out specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The court is under no obligation to plumb the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996). A "mere scintilla" of evidence in support of the nonmoving party's position is not enough to avoid summary judgment. *Daniels v. Woodside*, 396 F.3d 730, 734 (6th Cir. 2005). Rather, to preclude summary judgment, the nonmoving party must put forward probative evidence on which a jury could reasonably reach a verdict in that party's favor. *Anderson*, 477 U.S. at 251-52; *Lansing Dairy,* 39 F.3d at 1347. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, then the

10

moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

## II

TriHealth and Mayfield both argue that O.R.C. § 2305.251 gives them peer review immunity from Dr. Shahbabian's state law claims. That statute provides that "[n]o health care entity shall be liable in damages to any person for any acts, omissions, decisions, or other conduct within the scope of the functions of a peer review committee of the health care entity." O.R.C. § 2305.251(A). A "peer review committee" is a "quality assessment committee, performance improvement committee . . . or other committee that . . . conducts . . . quality review activities involving the competence of, professional conduct of, or quality of care provided by health care providers." O.R.C. § 2305.25(E)(1)(a). Dr. Shahbabian does not contest that the defendants are "health care entities" as defined by O.R.C. § 2305.25(A) or that the Quality Assurance Committee—which regularly conducts quality review activities—constitutes a peer review committee under the statute.

What the doctor does contest is whether the actions he complains of fell within the peer review process at all. Indeed, that is his only counterargument: he claims that the "actions of which [he] complained in this case were outside of the peer review process." (Doc. 186 at 75.) He does not offer any evidence in support of that defense. To see if he's right, it's necessary to examine the facts out of which his state law claims arise. To the extent those claims stem from any acts, omissions, decisions, or other conduct that falls within the scope of the functions of a peer review committee, they are barred under R.C. 2305.251(A). Phrased in the form of a question, the inquiry is this: Do any of Dr. Shahbabian's state law claims take issue with actions or any other conduct that fall within

11

the scope of a peer review committee?

His own theory of the case concedes that they do. Consider these headings from his opposition memorandum: "TriHealth uses a sham peer review process to involuntarily retire Shahbabian from surgery" (Doc. 186 at 53); "Mayfield begins to use the peer review process to obtain Shahbabian's neurosurgical practice" (*Id.* at 21). Clearly, Dr. Shahbabian himself believes that the peer review process led to his reduction in work. If the Court is going solely off Dr. Shahbabian's own framing of the issues, then TriHealth and Mayfield are immune from any of Dr. Shahbabian's state law claims that target the functions of the peer review process. O.R.C. § 2305.251(A); *Semertzides v. Bethesda N. Hospital*, 1st Dist. Hamilton No. C-180659, 2020 Ohio App. LEXIS 150 (Jan. 22, 2020). Nevertheless, the Court will address his counterargument that his claims do not arise from the peer review process.

The crux of that defense is that TriHealth unjustifiably and unilaterally reduced the amount of work available to him. But the record provides some critical context to the reduction of available work. First, it was not until *after* the Quality Committee had issued numerous negative case weights that it asked Dr. Shahbabian to suspend his surgical activity. The committee members were concerned that they were so frequently reviewing his performance and assigning him case weights for at-risk behavior. They were also concerned for patient safety. (Doc. 181-4 at Pg. ID 13863, 13866.) Clearly, those concerns arose directly from the functions of the peer review process.

Second, those concerns prompted the committee to ask Dr. Shahbabian to voluntarily stop operating. When he refused, the committee offered him a second choice:

12

whether he would voluntarily refrain from operating until another review could take place. He accepted this proposal and canceled his surgeries. (*Id.*) So, again, the peer review functions led to the temporary suspension of Dr. Shahbabian's operations.

Third, Dr. Shahbabian did not wait for that review to happen. Instead, he sent a letter to the medical staff president "voluntarily relinquish[ing]" his surgical privileges. (Def. Ex. 78, Doc. 181-4 at Page ID 13874.) Thus, although he had the opportunity to wait for another review, he chose to voluntarily give up his surgical privileges instead.

Given the above context, Dr. Shahbabian's reduction in work was based on the recurring reviews by the Quality Committee, that committee's concern for patient safety based on several negative case weights, and the committee's consequent request that the doctor suspend surgical operations. Dr. Shahbabian complied with that request. It is hard to see how any part of this process falls outside the peer review's normal functions.

The next question is which of the state law claims arise from conduct that fell within the scope of the peer review process. *See* O.R.C. § 2305.251(A) (providing for immunity for "conduct within the scope of the functions of a peer review committee"). Although practically all of the doctor's claims stand with at least one foot on the peer review proceedings, four of them stand entirely on those proceedings.

1. *Breach of contract* (Count 1). Dr. Shahbabian claims TriHealth unjustifiably reduced his work. But this happened after the Quality Committee's repeated assignments of negative case weights to his surgical outcomes, as determined through the peer review process. That bars this claim. O.R.C. § 2305.251(A).

2. *Common law fraud* (Count 8). Here Dr. Shahbabian alleged that he was unable

13

to meet the 11,700 wRVU production baseline without being able to perform neurosurgical procedures. Tied up in this claim is his charge that he would not have agreed to the "clawback" provision if he had known that TriHealth "intended to steal his practice and auction it to Mayfield." (Amended Compl. ¶ 112, Doc. 21.) But the ground on which this claim stands is his reduction in work based on the peer review proceedings. The reason he was unable to meet the 11,700 wRVU standard, he admits, is because he was not performing surgeries. And the reason he was not performing surgeries was because of the concerns raised based on the numerous peer review proceedings. That makes TriHealth immune under O.R.C. § 2305.251(A). Furthermore, he voluntarily relinquished his surgical privileges. So this claim fails.

3. *Tortious interference* (Count 9). Dr. Shahbabian alleges that Mayfield tortiously interfered with contract and prospective business relationships. According to him, Mayfield was behind the scenes persuading certain committee members to manufacture quality-of-care issues in his practice. If successful, the theory goes, Dr. Shahbabian's surgical practice would dry up and Mayfield could absorb his patients. The problem with this theory, besides being conjectural, is that the reduction in his work still remains the centermost fact. And the reduction in his work stemmed directly from the peer review proceedings. So Mayfield is immune from this claim.

4. *Common law civil conspiracy* (Count 10). Again, this claim emerges from the reduction in work available to Dr. Shahbabian based on the Quality Committee's numerous findings of at-risk behavior, so it cannot proceed.

Because the above claims seek liability for acts, decisions, and other conduct that

14

fall within the scope of the functions of a peer review committee, they are barred under O.R.C. § 2305.251(A). The Court thus grants summary judgment to Defendants on counts 1, 8, 9, and 10.

## III

Dr. Shahbabian also brings numerous discrimination claims and claims related to discrimination. He argues that, under federal and state laws, Defendants committed age discrimination, disability discrimination, retaliation, and aiding and abetting age discrimination. TriHealth moves for summary judgment on all these claims. The Court will address one at a time.

### A. Age discrimination (and aiding-and-abetting age discrimination) (Counts 2, 4, 5, and 7)

Dr. Shahbabian brings age discrimination charges against TriHealth under the Age Discrimination in Employment Act, 29 U.S.C. § 621, *et seq.* ("ADEA"), and O.R.C. §§ 4112.02(A), 4112.14(A), and 4112.99. The ADEA prohibits an employer from discharging an individual "because of such individual's age." 29 U.S.C. § 623(a)(1). O.R.C. § 4112.14(A) provides that no employer shall "discharge without just cause any employee aged forty or older who is physically able to perform the duties and otherwise meets the established requirements of the job." Federal courts analyze age discrimination claims brought under the Ohio statute using the same standards as federal claims brought under the ADEA. *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282–83 (6th Cir. 2012). TriHealth moves for summary judgment on the four claims related to age discrimination (counts 2, 4, 5, and 7).

15

To establish a claim for age discrimination under the ADEA, a plaintiff must prove, by a preponderance of the evidence, that his age was the "but-for" cause of the employer's adverse decision. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009). A plaintiff may make his case with direct evidence or circumstantial evidence. *Id.* at 177-78. Here, Dr. Shahbabian offers both direct and circumstantial evidence. The *McDonnell Douglas* burden-shifting framework does not apply when the plaintiff presents direct evidence of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985). So we start with direct evidence. *LaPointe v. United Autoworkers Loc. 600*, 8 F.3d 376, 380 (6th Cir. 1993).

### 1. Direct evidence

Direct evidence is evidence which, if believed, compels the conclusion that age was the "but for" cause of the employment decision. *Scheick v. Tecumseh Pub. Sch.*, 766 F.3d 523, 530 (6th Cir. 2014). Such evidence may exist when the decisionmaker, or an employee who influenced the decisionmaker, made discriminatory comments related to the employment action in question. *Gray v. Kroger Corp.*, 804 F. Supp. 2d 623, 629–30 (S.D. Ohio 2011). And, in the ADEA context, even when a plaintiff does present direct evidence of age discrimination, that is not always sufficient to create a question of fact for trial. *Scheick*, 766 F.3d at 532. The question in resolving an employer's motion for summary judgment is whether that direct evidence, taken as a whole and in a light most favorable to the plaintiff, permits a rational trier of fact to conclude that age was the but-for cause of the employer's decision. *Id.* (quoting *Gross*, 557 U.S. at 178). If the plaintiff meets his burden to produce evidence that permits a reasonable juror to find that age was the but-

16

for cause for the employment decision, a genuine issue of material fact exists and the case goes to trial. *Id.*

Dr. Shahbabian points to several things in the record he says are direct evidence of age discrimination, such as conversations about getting a medical examination because he was over 70; an email from an administrative assistant suggesting he was born in 1890; and other physicians' suggestions that he should consider retirement. Much of this material comes in the form of his transcribed voice recordings describing these encounters. A plaintiff's testimony, alone, generally fails to establish a question of fact as to whether discrimination happened. *See Brahmbhatt v. Gen. Prod. Corp.*, No. 1:12CV919, 2014 WL 2711839, at *11 (S.D. Ohio June 16, 2014), *report and recommendation adopted*, No. 1:12CV919, 2014 WL 3404655 (S.D. Ohio July 10, 2014). But more importantly, the but-for cause for Dr. Shahbabian's reduction in work and eventual cessation of surgical operations was, in the final analysis, his own voluntary relinquishment. (Def. Ex. 78, Doc. 181-4 at Pg. ID 13874.) He accepted the committee's proposal to stop operating pending a review of his performance. He had the opportunity to wait until that review. Instead, he relinquished his surgical privileges.

But maybe Dr. Shahbabian was constructively discharged? Not on this record. Looking a step back in the sequence of events that led to his voluntary relinquishment does not reveal facts that help him. The reason his ability to operate was questioned in the first place was because members of the Quality Committee had grown so concerned about his negative case weights that they asked him to voluntarily stop operating — which he did. How did those negative case weights come about? A panel of his medical peers —

17

not supervisors—had found that his surgical practice represented recurring risks to the hospital's patients. So, even if his own relinquishment of surgical privileges was not the but-for cause of his reduction in work, the closest alternate for causation is the peer review panel's professional opinion that his surgical practice was raising safety concerns for patients. That's not discrimination; that's just the committee's judgment based on numerous encounters with Dr. Shahbabian's surgical outcomes. *See Nemazee v. Mt. Sinai Med. Ctr.*, 56 Ohio St. 3d 109, 113, 564 N.E.2d 477, 481-82 (1990).

Direct evidence of age discrimination only exists when the intent to discriminate is neither vague nor ambiguous, but clear on the face of the evidence. *Alberty v. Columbus Twp.*, 730 F. App'x 352, 356–57 (6th Cir. 2018). Since either his relinquishment of privileges or suspension from surgery was the but-for cause, the other evidence he points to cannot also be the but-for cause. *See Guerrero v. Vilsack*, 134 F. Supp. 3d 411, 427 (D.D.C. 2015). Given Dr. Shahbabian's recurring entanglement with the peer review process, negative case weights resulting from that process, and voluntary relinquishment of his surgical privileges, he fails to present clear, unambiguous direct evidence of age discrimination.

### 2. Circumstantial evidence

Dr. Shahbabian also points to circumstantial evidence of age discrimination. To survive summary judgment without direct evidence, a plaintiff must satisfy the three-step burden-shifting framework articulated in *McDonnell Douglas*. First, he must establish a prima facie case of discrimination. *Blizzard*, 698 F.3d at 283. If he does that, then the defendant must "articulate some legitimate, nondiscriminatory reason" for the

18

termination. *Id.* (quoting *McDonnell Douglas*, 411 U.S. at 802. If the defendant does so, then the burden shifts back to the plaintiff to show that the defendant's stated reason was not the real reason—that is, "the employer's explanation was fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). Summary judgment is only appropriate if there is insufficient evidence to create a genuine dispute of material fact "at each stage" of the analysis. *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000).

Begin with whether Dr. Shahbabian has made a prima facie case of age discrimination. To do so, he must either present direct evidence of discrimination or establish (1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination. *Blizzard*, 698 F.3d at 283.

Dr. Shahbabian has not pointed to evidence that supports the fourth element. The circumstances leading up to his reduction in work and departure from surgery altogether do not support an inference of discrimination. Instead, those circumstances show that the medical staff in charge of reviewing surgical outcomes at Dr. Shahbabian's hospital had grown increasingly worried for the patients on whom he was operating.

Perhaps something sinister was afoot, he suggests. He argues that Defendants had targeted Dr. Tempel, a younger surgeon, to replace him. This line of reasoning is unconvincing for at least two reasons. First, discussions about or plans for someone's eventual retirement, without more, do not show age-based animus. *Woythal v. Tex-Tenn Corp.*, 112 F.3d 243, 247 (6th Cir. 1997); *Metz v. Titanium Metals Corp.*, 475 F. App'x 33, 35

(6th Cir. 2012). Compliance with the ADEA and succession planning are not mutually exclusive. *See also Boston v. Blue Cross & Blue Shield of Kansas, Inc.*, 431 F. App'x 763, 767 (10th Cir. 2011). Second, the inferences Dr. Shahbabian draws upon still fail to unseat the peer review findings and resulting concerns as the chief reasons leading up to the committee's conversation with him about suspending, at least temporarily, his surgeries. The hard facts of his negative performances, his peers' resulting concern, and his subsequent suspension from surgery all combine to dissolve Dr. Shahbabian's inference-filled image of subterfuge and discrimination.

Here, even if he had, on this record, presented a prima facie case, TriHealth has presented legitimate nondiscriminatory reasons for the employment decision: Dr. Shahbabian's poor surgical outcomes and patient safety. And his attempts at showing pretext fail. He claims that TriHealth's reasons had no basis in fact, did not actually motivate their conduct, and were insufficient to warrant the challenged conduct. For support, he points to positive reviews of his work and times when he met the standard of care.

But it is hard for the Court to see viability in these positions. First, he does not attempt to show that the outcomes for which he received negative case weights did not happen. *Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 890 (6th Cir. 2020) (to establish pretext by contesting the factual basis of an employer's rationale, employee must show the facts of the employer's allegation never occurred). So he forfeits his position that TriHealth's decision had no basis in fact. As it stands, the fact that he had some favorable reviews does not cancel out the other fact that, in several cases, he

20

received poor peer reviews.

That leaves the two arguments that his negative case weights did not actually motivate TriHealth's conduct or were insufficient to warrant that conduct. The evidence leaves those arguments wanting. The stakes of neurosurgery are immense. To prove that point, look no further than the March 2017 surgery that left the patient disabled. (Ringer Dep. 230-31, Doc. 171 at Pg. ID 11814-15.) No reasonable juror would think that reckless or recurring at-risk behavior in a neurosurgical context did not actually motivate or was insufficient to warrant the committee's discussion with Dr. Shahbabian about temporarily abstaining from operating. So he fails to show that TriHealth's reasons for reducing his workload were a pretext for discrimination.

*

For all these reasons, Dr. Shahbabian has failed to show there is a triable issue of fact on his age discrimination claims. Since his aid-and-abetting claim is tied up with his age discrimination claims, that claim fails too. Accordingly, the Court enters summary judgment for Defendants on counts 2, 4, 5, and 7.

### B. Retaliation (Counts 3 and 6)

Dr. Shahbabian brings claims for retaliation against TriHealth under 29 U.S.C. § 623 and O.R.C. § 4112.02(I). In the federal claim, he argues that he sued TriHealth for discrimination in the summer of 2018 and, after that, TriHealth retaliated by reducing his compensation to $10.00 per hour and notifying him that it would not be renewing his employment agreement. In the state claim, he asserts that he complained from 2015 to 2018 about age discrimination towards him. In retaliation for those complaints, he says

21

that TriHealth retaliated by requiring him to undergo a medical examination, requiring him in 2015 to seek other physicians' consent before performing certain surgeries, forcing him to relinquish his surgical privileges in 2017, threatening him with peer review proceedings for alleged patient complications, reducing his pay for failure to meet the 11,700 wRVU baseline, reassigning his surgical patients to younger doctors, and not renewing his employment agreement.

To make out a prima facie retaliation claim under the ADEA, a plaintiff must show that (1) he engaged in protected activity, (2) the defendant knew that he exercised a protected activity, (3) the defendant then took adverse employment action against him, and (4) a causal connection existed between the protected activity and the adverse employment action. *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491–92 (6th Cir. 2010). The causal connection required for a retaliation claim under the ADEA is the same but-for cause required in the context of Title VII retaliation. *See* 29 U.S.C. § 623(d) ("It shall be unlawful for an employer to discriminate against any of his employees . . . *because* such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter."); *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013) (extending the *Gross* but-for causation standard for ADEA claims to Title VII retaliation claims based on the use of the word "because" in both statutes); *Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (the anti-retaliation provisions in Title VII and ADEA are analytically similar). So to avoid summary judgment on a retaliation claim, a plaintiff has to offer evidence that permits a jury to conclude that, but for his engagement in a protected activity, the defendant would not

22

have taken the adverse employment action.

Timing is important in retaliation claims. *See Blizzard*, 698 F.3d at 290. Dr. Shahbabian filed his lawsuit on June 13, 2018 and the EEOC charge on July 25, 2018. But over a year before he did either of those things, on May 3, 2017, he had already been told that TriHealth was not going to renew his contract. (Shahbabian Dep. 267, Doc. 181-1 at Pg. ID 13401.) And, in March 2018—also before his filings—TriHealth had already taken steps to adjust his compensation. (Pl. Ex. 275, Doc. 159-38 at Pg. ID 10466; Cercek Dep. 110, Doc. 159 at Pg. ID 10224; Pl. Ex. 295, Doc. 162-17 at Pg. ID 10641.) So the non-renewal of his contract and the initial reduction of his pay could not have been retaliatory.

As for the claim that his pay was reduced to $10.00 an hour, Dr. Shahbabian does not appear to defend that position in his opposition memorandum. In any event, his reduced pay is tied to the overpayment issue: TriHealth was not willing to pay him more than $10.00 an hour because he owed TriHealth "a significant amount of money for the overpayments he has received based on his wRVU productivity." (Pl. Ex. 338, Doc. 151-40 at Pg. ID 7710.) So he now makes the argument that the attempted clawback itself was retaliatory. But here, another cause presents itself as responsible for TriHealth's clawback: the Agreement itself provides for reconciliation. (E.g., Doc. 88-1 at Pg. ID 733-34.) So, since the causation standard in an ADEA retaliation claim is but-for, and another cause exists for the adverse employment action, Dr. Shahbabian's actions cannot also be the but-for cause of TriHealth's attempted reconciliation. *See Guerrero*, 134 F. Supp. 3d at 427 (if an adverse employment action has more than one but-for cause, a retaliation claim under the ADEA will fail).

23

Dr. Shahbabian makes a couple more arguments, none availing.  He claims that he challenged the necessity of undergoing a medical exam and made it clear that he did not intend to retire.  These things, he appears to argue, constitute protected activities.  He does not point to record evidence showing that these statements are accurate or cite law that shows those activities are indeed protected.  But here, even if he had, it would not matter, for the following reasons.

*Intent to retire*.  Note first that the employment agreement expired in 2019 with no obligation on either party to renew.  Without a mutual promise that Dr. Shahbabian would continue working beyond the contract's expiration, it is irrelevant whether he indicated he would retire or not.  But as it is, he *did* tell colleagues that, after May 2017, he would "slow down" and "[Mayfield] can take over at that point."  (Doc. 181-3 at Pg. ID 13833; Shahbabian Dep. 247, Doc. 181-1 at Pg. ID 13381.) They asked if he wanted to "start a process where we actually decrease your operative experience."  (Doc. 181-3 at Pg. ID 13833; Shahbabian Dep. 247, Doc. 181-1 at Pg. ID 13381.)  His own notes from October 2016 record that he responded that his plan was "when my 5 years is over, I am done."  (Doc. 181-3 at Pg. ID 13833.)  So the record contradicts his argument that he indicated he did not intend to retire.

*Medical examination*.  TriHealth had justified concerns over Dr. Shahbabian's health and the quality of care he was providing his patients.  He had fainted in the operating room in January 2014, right around the beginning of his TriHealth employment.  (Shahbabian Dep. 143, Doc. 164-1 at Pg. ID 10676.)  He admitted that a surgeon who suffered from recurrent light-headedness would be concerning.  (*Id.* at 143-44, Doc. 181

24

at Pg. ID 13279.) Health problems that significantly affect performance of essential job functions may justify a physical examination. An employer is allowed to determine an employee's fitness for the job beyond circumstances in which they pose a direct threat. *See Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999). So, even if he did "challenge" the necessity of a medical exam, opposing a justified medical exam is not a protected activity. *See id.*; *Sloan v. Repacorp, Inc.*, 310 F. Supp. 3d 891, 901 (S.D. Ohio 2018) (in the disability context, a retaliation claim cannot stand when an employee refuses to proper request for a medical exam).

Since Dr. Shahbabian fails to identify any outstanding material facts for trial on his retaliation claims, TriHealth is entitled to summary judgment on counts 3 and 6.

### C. Disability discrimination (Counts 11 and 12)

Dr. Shahbabian took off time in 2017 and 2018 for knee surgery and following a heart attack. While he was off work for the knee surgery, TriHealth reduced his salary for his inability to meet the baseline wRVU standard, a fact TriHealth does not deny. (Amended Compl. at ¶¶ 131-42; Doc. 137 at 28.) He brings disability claims under state and federal law. TriHealth moves for summary judgment on them.

Ohio disability discrimination law, O.R.C. § 4112.02(A), generally applies the same analysis as the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA"). *Schwendeman v. Marietta City Sch.*, 436 F. Supp. 3d 1045, 1059 (S.D. Ohio 2020); *Columbus Civ. Serv. Comm. v. McGlone*, 82 Ohio St. 3d 569, 573, 697 N.E.2d 204, (1998). The ADA prohibits employers from discriminating against an employee "because the employee is disabled, because the employee has a record of being disabled, *or* because the employer

'regards' the employee as disabled." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 318 (6th Cir. 2019) (citing 42 U.S.C. §§ 12102(1), 12112(a)).

Dr. Shahbabian attempts to make out a "regarded as" claim. An employee makes a "regarded as" claim by establishing that "he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(1)(C), 3(A). *See also Babb*, 942 F.3d at 319. If the employee shows that his employer believed that the employee had a "physical or mental impairment," then the employer may rebut that showing by pointing to evidence "that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor." *Id.* (quoting 29 C.F.R. § 1630.15(f)).

If the employee establishes that his employer "regarded" him as disabled under the above standard, then he next must show that the employee took an adverse employment action against him "*because of*, or 'but-for,' their actual or perceived physical or mental impairment." *Id.*; *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 321 (6th Cir. 2012) (en banc) (applying *Gross*'s but-for causation standard to the ADA). An employee may prove the causal connection with direct evidence or circumstantial evidence. Dr. Shahbabian offers both kinds of evidence here.

We begin with direct evidence. Direct evidence under the ADA is evidence which, if believed, requires the conclusion that unlawful discrimination was the but-for cause of the employer's actions. *See Lewis*, 681 F.3d at 321 (holding that ADA cases require a but-for cause); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008) (describing

26

direct evidence generally).  Dr. Shahbabian offers several statements by the defendants as potential pieces of direct evidence, such as comments that he looked "rickety" and worn out, shuffled his feet, and would be slowing down his practice soon.  In response, TriHealth argues that it did not perceive the doctor as disabled—rather, it made inquiries related to his competence.

None of the statements Dr. Shahbabian points to *require* the conclusion that they were the but-for cause of his reduction in salary.  To find otherwise would be to conclude that, but for some comments from Dr. Shahbabian's colleagues, TriHealth would not have reduced his salary.  But that ignores the fact that TriHealth reduced his salary consistently with other doctors who take medical leave.  (Koch Ex. 297, Doc. 162-19 at Pg. ID 10644.)  So, here, the but-for cause was an organizational standard, not discrimination.

Now we turn to circumstantial evidence.  The Court assumes Dr. Shahbabian lays out a prima facie case of disability discrimination. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 894 (6th Cir. 2016), *abrogated on other grounds by Babb*, 942 F.3d at 320 (a prima facie case requires the employee to show that (1) he is disabled (or, in this context, was regarded as disabled), (2) he was otherwise qualified for the position, with or without reasonable accommodation, (3) he suffered an adverse employment decision, (4) the employer knew or had reason to know of his disability, and (5) the position remained open while the employer sought other applicants).  TriHealth's legitimate, nondiscriminatory reason for reducing his salary was that he was paid according to a standard practice that applied to other doctors during periods they were not working.  (Doc. 137 at 28-29.)

To show pretext, Dr. Shahbabian incorporates his age discrimination arguments.

27

But those arguments do not apply to his disability claim. The allegations in his age discrimination claims were that TriHealth used the peer review proceedings to squeeze him out and replace him with a younger surgeon. Those are different issues than the one at play in his disability claim—his reduction in salary during medical leave. But to the extent he intends to rehearse his age discrimination arguments on his disability claim, they fail here too. Neurosurgery is high-stakes and TriHealth was justified to ensure that its patients were receiving treatment from a physician who was fit to do the job. An employer's perception that poor health is negatively impacting an employee's job performance is not tantamount to regarding that employee as disabled. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 810 (6th Cir. 1999). Under that logic, an employer is permitted to determine why an employee's job performance is suffering. *See Pena v. City of Flushing*, 651 F. App'x 415, 420 (6th Cir. 2016). These principles are especially germane in light of the doctor's repeated run-ins with the Quality Committee and the issuance of several of the most serious case weights a physician can receive at TriHealth. On this record, for these reasons, Dr. Shahbabian fails to show a genuine issue of material fact exists on his disability claim. *E.g., Anderson*, 477 U.S. at 251-52; *Celotex*, 477 U.S. at 323. Consequently, TriHealth is entitled to summary judgment on counts 11 and 12.

## IV

TriHealth G, LLC ("TriHealth G"), advanced counterclaims against Dr. Shahbabian for breach of contract and unjust enrichment. Both counterclaims concern an alleged overpayment of $679,711.61 by TriHealth G to Dr. Shahbabian. TriHealth G moves for summary judgment on the breach of contract counterclaim. (Doc. 137 at 29.)

Dr. Shahbabian moves for summary judgment on the unjust enrichment counterclaim. (Doc. 136.)

After Dr. Shahbabian voluntarily resigned his surgical privileges in June 2017, his productivity declined. One TriHealth executive observed that they would "need to look at Dr. Shahbabian's comp[ensation]," as he was "no longer doing surgery" and he "[did] not want to get him in a negative situation." (Pl. Ex. 293, Doc. 162-15 at Pg. ID 10636.) The two sides were negotiating a new contract. (*Id.* a Pg. ID 10635.) In March 2018, his pay was reduced. (Pl. Ex. 295, Doc. 162-17 at Pg. ID 16041.) His contract expired on May 1, 2019. (Def. Ex. 80, Doc. 181-4, Pg. ID 13876.)

TriHealth performed a reconciliation and on May 2, 2019 sent Dr. Shahbabian notice that he was paid $679,711.61 in excess of the compensation commensurate with his required output of 11,700 wRVUs annually. (Def. Ex. 81, Doc. 181-4 at Page ID 13877.) TriHealth argues that, under the employment agreement, the doctor was required to pay that amount within 30 days of receiving the notice, has not done so, and is in breach of the contract. In the alternative, TriHealth claims that Dr. Shahbabian should be required to disgorge the overpayment under a theory of unjust enrichment.

Dr. Shahbabian has a very different view of the matter. By his lights, TriHealth G is barred from enforcing the contract because it violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b), and because it prevented the performance of a condition or made performance of the contract impossible.

Under Ohio law, the elements of breach of contract counterclaim are (1) the existence of a contract, (2) performance by the counterclaimant, (3) breach by the

opposing party, and (4) damage or loss to the counterclaimant. *See In re Nat'l Century Fin. Enterprises, Inc., Inv. Litig.*, 617 F. Supp. 2d 700, 720 (S.D. Ohio 2009).

First consider what evidence TriHealth G has put forth in support of those elements. One, TriHealth G has submitted the Employment Agreement and the Amended and Restated Second Amendment to Employment Agreement. (*See* Def. Ex. 19, p. 3 ¶ 4, Doc. 181-2 at Pg. ID 13677; Ex. K-1 to Wagner Decl., Doc. 137-11 at Pg. ID 4270, 4286.) The amended agreement contains the following provision:

> If Physician [Shahbabian] separates from Company's [TriHealth G's] employment for any reason, then Company shall reconcile the payments provided to Physician against the compensation Physician earned. The Company shall deliver notice ("Reconciliation Notice") to Physician of the result of the reconciliation within forty-five (45) days after Physician separates from Company's employment. Physician shall repay any overpayment (with any outstanding amount to be recouped also to be deemed an overpayment) or Company shall pay the Physician any balance, within thirty (30) days after Company delivers the Reconciliation Notice.

(Doc. 137-11 at Pg. ID 4288 ¶ 4.) Thus, TriHealth G had the contractual duty to perform a reconciliation and the overpaid party had the contractual duty to repay any overpayment. Dr. Shahbabian concedes that a written contract governs this dispute. (Doc. 188.) Two, TriHealth has complied with its obligations under the contract. The last day of Dr. Shahbabian's employment was April 30, 2019. TriHealth G submitted evidence that shows that it complied with its obligation on May 2, 2019 (well within 45 days of the parties' separation) by sending notice to the doctor to reconcile the overpayments. (Doc. 137-11 at Pg. ID 4269.) It also presented evidence supporting its specific claim to the amount of $679,711.61. (Doc. 137-11 at Pg. ID 4290.) Three, it is clear that Dr. Shahbabian has not paid that amount—he admits he has not (Doc. 186 at 66)

("TriHealth is not entitled to the repayment of the $679,711.61 it paid to Shahbabian.").

And, four, since Dr. Shahbabian has not paid, naturally TriHealth G has suffered damage

by the amount it overpaid him. All of this shows that TriHealth G has established each

element of its breach of contract counterclaim.

In light of these facts, TriHealth G has met its burden of conclusively showing that

there exists no genuine dispute of material fact as to what contract applies, what

provisions of that contract govern the breach of contract counterclaim, whether Dr.

Shahbabian breached that provision, or how much money is at stake. *See Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir.

1994). That means it is the doctor's responsibility to point out specific facts that pose a

genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

It serves clarity to first note what Dr. Shahbabian *does not* argue. He does not

dispute that the contract TriHealth G identifies is the operative contract. (*See* Def. Ex. 19,

p. 3 ¶ 4, Doc. 181-2 at Pg. ID 13677.) Nor does he offer an opposing interpretation of the

contractual language requiring TriHealth G to reconcile payments provided against

compensation earned. (*Id.*) Likewise, there is no disagreement that that same provision

requires a physician to repay overpayments after receiving a Reconciliation Notice. (*Id.*)

He does not deny that he agreed to this contract. (*See id.* at Pg. ID 13676.) He also does

not raise an issue that the specific reckoning of overpayment TriHealth sent him was

miscalculated or inaccurate. (Def. Ex. 81, Doc. 181-4 at Pg. ID 13877.) Since no factual

issue presents itself as to these issues, it falls to Dr. Shahbabian to explain whether some

other fact compels the Court to deny summary judgment on the counterclaim and send

31

the matter to a jury.

To that end, he relies on the two defenses of illegality and impossibility.

*Illegality*. Dr. Shahbabian first invokes the defense of illegality. A party may not recover damages for breach of an illegal bargain. *Associated Press v. Taft-Ingalls Corp.*, 340 F.2d 753, 759 (6th Cir. 1965) (quoting Restatement: Contracts § 598). The burden of proving that a contract is illegal is on the party making the argument. *Id.* Dr. Shahbabian argues that TriHealth and Mayfield violated the Anti-Kickback Statute (AKS) and, consequently, TriHealth G is not entitled to summary judgment on its counterclaim.

The AKS is a criminal statute that makes it illegal for someone to "knowingly and willfully solicit[] or receive[] any remuneration (including any kickback, bribe, or rebate) . . . in return for referring an individual . . . for the furnishing or arranging for the furnishing of any item or service for which payment may be made . . . under a Federal health care program[.]" 42 U.S.C. § 1320a-7b(b)(1)(A). A similar crime under the same statute occurs when someone "knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) . . . to any person to induce such person . . . to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made . . . under a Federal health care program[.]" 42 U.S.C. § 1320a-7b(b)(2)(A). The term "remuneration" embraces "anything in value of any form whatsoever." *United States v. Millennium Radiology, Inc.*, No. 1:11CV825, 2014 WL 4908275, at *4 (S.D. Ohio Sept. 30, 2014) (*quoting United States v. The Health All. of Greater Cincinnati*, No. 1:03-CV-00167, 2008 WL 5282139, at *7 (S.D. Ohio Dec. 18, 2008)).

Dr. Shahbabian argues that Defendants violated both of the above subsections of the AKS. Remuneration, he says, includes patient referrals from one medical provider to another. *State v. MedImmune, Inc.*, 342 F. Supp. 3d 544, 552 (S.D.N.Y. 2018). He expounds on the many ways TriHealth and Mayfield exchanged remuneration.

The starting point for the illegality defense, however, is not the character of the parties, but whether giving legal effect to the contract would be tantamount to enforcing a violation of the law in question. *Kelly v. Kosuga*, 358 U.S. 516, 520-21 (1959). The scope of the illegality defense does not go further than the statute that has allegedly been violated. *Id.* at 520. If the enforcement of a contract requires a court to carry out something that a federal statute specifically prohibits, that is one thing. *E.g., Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 82 (1982); *Cont'l Wall Paper Co. v. Louis Voight & Sons Co.*, 212 U.S. 227, 261 (1909). Courts will entertain the defense of illegality when confronted with such contracts. But it is quite another thing to ask a court to assist a party in avoiding a contractual duty that is not in and of itself illegal and to which that party agreed. *E.g., D.R. Wilder Mfg. Co. v. Corn Prod. Ref. Co.*, 236 U.S. 165, 173 (1915). And, even assuming peripheral criminal conduct, courts must decline such invitations. The Supreme Court has admonished federal courts against creating "a policy of nonenforcement of contracts" on terms beyond what a federal law has prohibited. *Kelly*, 358 at 519, 521. An "overriding general policy" applies in order to "prevent[] people from getting other people's property for nothing when they purport to be buying it." *Id.* at 520-21 (*quoting Cont'l Wall Paper*, 212 U.S. at 271 (Holmes, J., dissenting)). For this reason, courts do not judicially add sanctions to federal criminal statutes by fashioning exit ramps from otherwise legal

33

contractual obligations. *See id.* at 519.

Ohio law applies the same limiting principle. A court will deny summary judgment if there is a genuine dispute of material fact as to the legality of the very object a contract seeks to achieve. *Blanchard Valley Farmers Coop., Inc. v. Rossman*, 145 Ohio App. 3d 132, 138, 761 N.E.2d 1156, 1161 (3d Dist. 2001). Otherwise, courts enforce a contract to the extent it conforms to the law, even if some other part of it is illegal. *See Toledo Police Patrolmen's Assn., Loc. 10, IUPA v. Toledo*, 94 Ohio App. 3d 734, 740, 641 N.E.2d 799, 803 (6th Dist. 1994).

The Sixth Circuit recently showed how the Supreme Court's decisions in *Kelly* and *Kaiser* apply to allegedly illegal contracts. In *Hemlock Semiconductor Operations, LLC v. SolarWorld Indus. Sachsen GmbH*, 867 F.3d 692, 698 (6th Cir. 2017), a company, Hemlock, sued to enforce a contract that would require another company, Sachsen, to make payments it had promised to make for polysilicon. *Id.* at 699. Sachsen raised the illegality defense, arguing that various provisions of the governing contract violated the antitrust laws of the European Union and Germany. *Id.* at 697-98. The court's review of *Kelly* and *Kaiser* showed the harmony between the two cases: *Kelly* enforced a promise that was legal—even though the greater agreement contained an illegal promise—while *Kaiser* declined to enforce a promise because it was illegal in and of itself. *Id.* at 699. The question, in other words, is whether "the judgment of the Court would itself be enforcing the *precise conduct made unlawful by the Act.*" *Id.* at 698 (quoting *Kelley*, 358 U.S. at 520).

On the spectrum between *Kaiser* and *Kelly*, the *Hemlock* panel found that the provision under review was more analogous to *Kelly*. There was nothing illegal about

34

the take-or-pay provision. And that was the provision Hemlock was attempting to enforce. Plus, policy interests applied to prevent one party obtaining the benefit of the bargain without paying for it. *Id.* at 699-700.

*Kelly*, *Kaiser*, and *Hemlock* lay out this Court's task: identify the terms of the contract, determine what the federal criminal statute prohibits, and ask whether the contract violates the statute. (Though these cases address whether contracts were illegal under various antitrust laws, the reasoning applies in the context of other laws too. *See Bruce's Juices v. Am. Can Co.*, 330 U.S. 743, 754 (1947).) The Court only reviews the "particular conduct" the plaintiff or counterclaimant seeks to enforce, irrespective of whether that conduct would be illegal when combined with other actions contemplated under the contract. *Hemlock*, 867 F.3d at 700. TriHealth G seeks to enforce the contract's reconciliation provision, under which it claims it is entitled to recoup $679,711.61 worth of overpaid compensation. In response, Dr. Shahbabian focuses his discussion on the various forms of unlawful remuneration that TriHealth and Mayfield exchanged and received. He emphasizes that TriHealth and Mayfield had an illegal arrangement under the AKS.

Absent from Dr. Shahbabian's position, however, is any discussion of what makes *the contract* illegal. To prevail under the illegality defense requires a showing that to enforce the contract would be to ratify conduct that would constitute "an illegal undertaking" under some law. *See Kaiser*, 455 U.S. at 79. Nothing in Dr. Shahbabian's theory, however, hints at why requiring him to repay money he did not earn under the contract would violate the AKS, which forbids receiving money for referring patients

35

whose treatment is paid for by a federal healthcare program.

The lack of overlap is understandable—the contract and the statute apply to completely different subject matters. On one hand, the contract regulates conduct between two private parties, providing for reconciliation of overpayments in the event one of those parties received more than he earned. On the other hand, the AKS prohibits parties from receiving, soliciting, paying, or offering to pay someone money in exchange for referring patients whose treatment would be paid for by federal healthcare programs. The contract and the statute are simply unrelated. Nothing in the contract falls on the wrong side of the AKS. And none of Dr. Shahbabian's claims about the supposedly criminal business arrangements have anything to do with the contract at issue. Application of the contract, then, would not enforce conduct that the AKS criminalizes. *Hemlock*, 867 F.3d at 698 (quoting *Kelley*, 358 U.S. at 520).

In short, in alleging that Defendants violated the AKS, Dr. Shahbabian raises factual controversies that may or may not be relevant to some other scheme but are "are entirely unrelated to the contract claim before us." *Nat'l Souvenir Ctr., Inc. v. Historic Figures, Inc.*, 728 F.2d 503, 516 (D.C. Cir. 1984). So the defense of illegality is unavailing.

*Impossibility, etc.* Dr. Shahbabian also raises interconnected defenses that his performance under the contract was made impossible, prevented, or otherwise frustrated by TriHealth's acts, not his. He appears to rely on the same arguments that he makes above—that it was the defendants' illegal conduct that made his performance impossible.

The doctrine of impossibility of performance excuses performance under a contract when an unforeseeable event renders performance impossible. *Lehigh Gas-Ohio,*

36

*L.L.C. v. Cincy Oil Queen City, L.L.C.*, 66 N.E.3d 1226, 1231, 2016-Ohio-4611, ¶ 15 (1st Dist.). The frustration of purpose doctrine applies when, "after a contract is made, a party's principal purpose is substantially frustrated without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made." *Donald Harris L. Firm v. Dwight-Killian*, 166 Ohio App. 3d 786, 2006-Ohio-2347, 853 N.E.2d 364, ¶ 16 (6th Dist.) (quoting Restatement 2d: Contracts (1981)). When that happens, the party's duties of performance are discharged. *Id.* That doctrine, however, is not widely accepted in Ohio. *Id.* Lastly, under the prevention of performance doctrine, "a party who prevents another from performing its contractual obligations cannot rely on that failure of performance to assert breach of contract." *Lucarell v. Nationwide Mut. Ins. Co.*, 152 Ohio St. 3d 453, 2018-Ohio-15, 97 N.E.3d 458, ¶ 54.

None of these theories applies here. Dr. Shahbabian claims that Defendants' alleged criminal behavior made it impossible for him to perform his obligations under the contract. The record tells a different story. The testimony and exhibits show that it was Dr. Shahbabian's pattern of serious and recurring surgical complications that compelled the Quality Committee to ask him to voluntarily suspend his surgical operations. (Doc. 181-4 at Page ID 13863, 13866.) Part of that deal was a subsequent review of his performance. But he did not wait for that review. Instead, he wrote a letter to Dr. LeMasters voluntarily relinquishing his surgical privileges. These facts eliminate any grounds on which to apply Dr. Shahbabian's various defenses.

It was clearly foreseeable that, if he had no more surgical privileges, then he would not be able to reach his wRVU standard. So the doctrine of impossibility of performance

fails. *See Lehigh* at ¶ 16.  Similarly, it cannot be said that the principal purpose of the contract was frustrated without any fault on Dr. Shahbabian's part.  He gave up his privileges and prevented the review of his surgeries to go any further.  So his frustration of purpose argument falters too.  And so does his prevention of performance position:  TriHealth did not prevent him from performing his contractual obligations—this can hardly be the case, since TriHealth offered Dr. Shahbabian the option to temporarily suspend his operations until they had obtained outside review of his surgical cases.  (Doc. 181-4 at Page ID 13863, 13866.)  He had appeared to accept the Quality Committee's arrangement, but he later surrendered his privileges.  This shows that it was Dr. Shahbabian who prevented himself from being able to fully perform his contractual obligations.

For these reasons, Dr. Shahbabian succeeds in none of his defenses that the contract was somehow impossible to perform.

*Nonpayment*.  Dr. Shahbabian devotes one sentence to the claim that TriHealth G has not demonstrated that it actually paid him the money it says it did.  Two problems:  That position is inconsistent with his admissions that TriHealth *did* pay him that amount.  (Doc. 186 at 66) ("TriHealth is not entitled to the repayment of the $679,711.61 it paid to Shahbabian.").  And he makes no attempt to introduce any factual issues regarding the documentations of overpayment TriHealth G has provided.  (Ex. K-1 to Wagner Dec., Doc. 137-11 at Pg. ID 4269, 4290-92; Pl. Ex. 253, Doc. 159-28 at Pg. ID 10438-45, 10466.)  A party waives issues he adverts to in a perfunctory way, without some effort to develop the argument. *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997).  The Court need not

address this skeletal argument any further. *United States v. Fowler*, 819 F.3d 298, 309 (6th Cir. 2016).

Since TriHealth G proves the elements of breach of contract and none of Dr. Shahbabian's defenses to that counterclaim succeed, the Court grants summary judgment to TriHealth G on its breach of contract counterclaim.

\*

One last issue remains. An unjust enrichment claim cannot survive when a contract exists. *Bickham v. Standley*, 183 Ohio App. 3d 422, 2009-Ohio-3530, 917 N.E.2d 330, ¶ 14 (3rd Dist.). That doctrine "applies 'in the absence' of a contract, not in the place of one." *Gerboc v. ContextLogic, Inc.*, 867 F.3d 675, 679 (6th Cir. 2017). Because the Court has found that a contract exists, TriHealth G's unjust enrichment counterclaim is foreclosed. The Court thus grants Dr. Shahbabian's motion seeking summary judgment on that counterclaim (Doc. 136).

## V

For the reasons above, the Court **GRANTS** the parties' motions for summary judgment (Docs. 136, 137, and 138) and orders the following:

(1) The Court **GRANTS** summary judgment in favor of TriHealth, Inc., and TriHealth G on Counts 1, 2, 3, 4, 5, 6, 7, 8, 10, 11, and 12.

(2) The Court **GRANTS** summary judgment in favor of Mayfield on Counts 7, 9, and 10.

(3) The Court **GRANTS** summary judgment in favor of Dr. Shahbabian on TriHealth G's unjust enrichment counterclaim.

(4) The Court **GRANTS** summary judgment in favor of TriHealth G on its breach of contract counterclaim.

(5) As the Court has entered summary judgment in TriHealth G's favor on its breach of contract counterclaim, the Court awards TriHealth G $679,711.61. Counsel for TriHealth G shall calculate the interest that has accrued on that amount between May 2, 2019 (when TriHealth submitted the Reconciliation Notice) and the day this Order is entered. TriHealth G's counsel shall then submit that calculation to counsel for Dr. Shahbabian, strictly for purposes of confirming that the calculation is accurate. The parties shall agree to a sum of additional interest and submit a joint proposed order awarding that amount within 30 days of this Order.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO

By: _____

JUDGE MATTHEW W. McFARLAND

40